MONIQUE C. WINKLER (Cal. Bar No. 213031)
SUSAN F. LAMARCA (Cal. Bar No. 215231)
 lamarcas@sec.gov
JASON M. BUSSEY (Cal Bar No. 227185)
 busseyja@sec.gov
THEIS FINLEV (Cal. Bar No. 264879)
 finlevt@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 5:23-cv-03300-BLF |
| Plaintiff, | Related Case: |
| v. | Case No. 5:21-cv-06374-BLF |
| VIDUL PRAKASH, | SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS |
| Defendant. | |

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................. 1

II.     SUMMARY OF FACTUAL ALLEGATIONS ............................................... 2

III.    ARGUMENT .................................................................................................... 6

        A.      Legal Standards Disfavor Motions to Dismiss ....................................... 6

        B.      The Complaint Adequately Pleads Defendant's Negligence ............................... 6

        C.      The Complaint Adequately Pleads Defendant's Violation of Section 17(a)(3) . 10

        D.      The Complaint Adequately Pleads Defendant's Violation of Section 14(a)  ........ 14

        E.      The Complaint Properly Requests an Equitable Officer and Director Bar ........ 16

IV.     CONCLUSION .................................................................................................. 19

**TABLE OF AUTHORITIES**

<u>CASES</u>

*Aaron v. SEC*, 446 U.S. 680 (1980)........................................................................................... 12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................... 6

*Bain v. California Tchrs. Ass'n*, 891 F.3d 1206 (9th Cir. 2018)................................................... 6

*Fecht v. Price Co.*, 70 F.3d 1078 (9th Cir. 1995) ........................................................................ 6

*Feola v. Cameron*, No., 2016 WL 11750382 (C.D. Cal. Aug. 25, 2016) ........................................ 9

*In re Alphabet, Inc. Sec. Litig.,* 1 F.4th 687 (9th Cir. Jun. 16, 2021) ..................................... 11-13

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
    324 F. Supp. 2d 474 (S.D.N.Y. 2004*)* .................................................................................. 8

*In re Bank of Am. Sec., Deriv., & ERISA Litig.*, 757 F. Supp. 2d 260 ................................. 15, 16

*In re Charter Commc'ns, Inc., Sec. Litig.*, 443 F.3d 987 (8th Cir.2006) ...................................... 13

*In re JPMorgan Chase & Co. Sec. Litig.,* 2007 WL 4531794 (N.D. Ill. Dec. 18, 2007) ................ 9

*In re McKesson HBOC, Inc. Sec. Litig.,* 126 F. Supp. 2d 1248 (N.D. Cal. 2000)........................... 9

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.,*
    480 F. Supp. 3d 1050 (N.D. Cal. 2020) ................................................................................ 18

*Lair v. Bullock,* 697 F.3d 1200 (9th Cir. 2012) ............................................................................ 17

*Liu v. SEC,* 140 S. Ct. 1936 (2020)..................................................................................... 16, 17

*Lorenzo v. SEC*, 139 S. Ct. 1094 (2019)............................................................................... 10-13

*Malouf v. Sec. & Exch. Comm'n*, 933 F.3d 1248 (10th Cir. 2019)............................................... 11

*Mendell v. Greenberg*, 612 F. Supp. 1543 (S.D.N.Y. 1985).................................................. 15, 16

*SEC v. Daifotis,* 2011 WL 2183314 (N.D. Cal. June 6, 2011) ............................................. 12, 13

*SEC v. Dain Rauscher, Inc.*, 254 F.3d 852 (9th Cir. 2001) ............................................. 6, 7, 9, 12

*SEC v. Dalius,* 2019 WL 13178869 (C.D. Cal. Sept. 12, 2019).................................................. 18

*SEC v. Earle*, 2023 WL 2899529 (S.D. Cal. Apr. 11, 2023)....................................................... 13

*SEC v. Falstaff Brewing Corp.*, 629 F.2d 62 (D.C. Cir. 1980) .............................................. 14-16

*SEC v. First Pac. Bancorp*, 142 F.3d 1186 (9th Cir. 1998)................................................... 17, 18

*SEC v. Gabelli*, 653 F.3d 49 (2d Cir. 2011)...................................................................... 18

*SEC v. Gault*, 751 F. App'x 974 (9th Cir. 2018).............................................................. 17

*SEC v. Hofmann*, 2021 WL 4125076 (S.D.N.Y. Sept. 9, 2021)....................................... 17

*SEC v. Hurgin*, 484 F. Supp. 3d 98 (S.D.N.Y. 2020) ...................................................... 16

*SEC v. ITT Educ. Servs., Inc.*, 303 F. Supp. 3d 746 (S.D. Ind. 2018)............................ 14

*SEC v. Jensen*, 2013 WL 6499699 (C.D. Cal. Dec. 10, 2013) .......................................... 9

*SEC v. Jensen*, 835 F.3d 1100 (9th Cir. 2016) .......................................................... 9, 10

*SEC v. Mercury Interactive, LLC*, 2008 WL 4544443 (N.D. Cal. Sept. 30, 2008) ..................... 7

*SEC v. Pocklington*, 2018 WL 6843665 (C.D. Cal. Nov. 29, 2018)................................. 9, 10, 12

*SEC v. Richman*, 2021 WL 5113168 (N.D. Cal. Nov. 3, 2021) ........................................ 11

*SEC v. Rio Tinto,* 41 F.4th 47 (2d Cir. 2022)............................................................ 13, 14

*SEC v. Shanahan*, 646 F.3d 536 (8th Cir. 2011) ............................................................ 10

*SEC v. Wilcox*, 2023 WL 2617348 (D. Mass. Mar. 23, 2023)........................................... 14

*Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040 (9th Cir. 2006) ........................... 12, 13

*United States v. Hitachi Am., Ltd.*, 172 F.3d 1319 (Fed. Cir. 1999) ............................... 13

*Walling v. Beverly Enters.*, 476 F.2d 393 (9th Cir. 1973) ................................................. 6

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
      655 F.3d 1039 (9th Cir. 2011) ............................................................................. 13, 14

*Yamamoto v. Omiya*, 564 F.2d 1319 (9th Cir. 1977) ...................................................... 15

STATUTES

Securities Act Section 17(a), 15 U.S.C. § 77q(a)..................................................... *passim*

Exchange Act Section 14(a), 15 U.S.C. § 78n ......................................................... *passim*

Exchange Act Section 21(d)(5), 15 U.S.C. § 78u(d)(5)........................................... *passim*

## I.    INTRODUCTION

The Securities and Exchange Commission brings this case against Defendant Vidul Prakash, formerly Chief Financial Officer (CFO) of View, Inc., because he failed to ensure View properly accrued for and disclosed over $20 million in liabilities that it expected to incur to address a manufacturing defect with its "smart" windows.

In his motion, Defendant primarily argues the Complaint fails to plead negligence, the standard underlying each of the SEC's claims. But, according to the Complaint, Defendant knew that his team, when determining what to accrue, had excluded certain costs (those associated with installing replacement windows); he knew why they did that (because View's window warranty did not require it to pay installation costs); he knew facts undermining that rationale (the Company decided to cover all of those costs regardless of the warranty limits); but he did not ensure his team considered those facts or corrected its analysis. As a result, View repeatedly provided investors and the public with materially inaccurate financials. Once those financials were eventually restated, View's reported liabilities for the relevant period more than doubled. These allegations establish, at the very least, Defendant's negligence.

Defendant attempts to avoid this conclusion by emphasizing that management's decision to cover installation costs was "well known" in the company. But, as the Complaint describes, what was well known was that View had paid installation costs in the past, not the critical fact that it would pay all such costs going forward. And, regardless of what others knew, the Complaint establishes Defendant knew and should have considered the decision, which is all that is required to establish *his* negligence. Defendant also protests that he did not perform the erroneous analysis himself. But the Complaint alleges "*Prakash* was responsible for ensuring that View properly accounted for and disclosed its liabilities." He not only "assembled" the team that assessed what liabilities to accrue but "reviewed" and "approved" its conclusion; then, as CFO, Defendant signed SEC submissions incorporating the team's analysis. He did so despite being repeatedly made aware of information that undermined a key assumption of the analysis.

Next, Defendant argues that, to plead a violation of Section 17(a)(3) of the Securities Act of 1933 ("Securities Act"), the Complaint must allege his participation in a "scheme"—which he

further argues is limited to inherently deceptive conduct beyond misstatements, such as sham transactions and forgeries. Defendant's argument, if accepted, would require the Court to disregard the clear language of this statute, which unambiguously anticipates violations founded on a variety of conduct, not just "schemes." It would also require the Court to ignore controlling Supreme Court and Ninth Circuit precedent that even what Defendant terms "scheme" liability need not involve conduct beyond misstatements. Finally, as applied here, Defendant's argument would lead to an absurd result: that to plead a purely negligence-based claim, the SEC must establish that Defendant acted in a *deliberately* deceptive manner.

Defendant attempts to evade liability under Section 14 of the Securities Exchange Act of 1934 ("Exchange Act") by arguing that the Complaint "fails to show a substantial connection between the use of Mr. Prakash's name and the solicitation effort." But, as longstanding law makes clear, a name and a solicitation are substantially connected when an individual's abilities and role are offered as a reason for investors to approve the transaction. Here, the proxy at issue referenced Defendant over 20 times, declared he would become CFO of the merged entity, and touted his professional accomplishments.

Finally, Defendant urges the Court to dismiss the SEC's request for an officer and director bar under Exchange Act Section 21(d)(5) by arguing that relief is either categorically non-equitable or appropriate only in scienter-based cases. The Ninth Circuit, however, has held that courts have "broad *equitable* powers …to order an officer and director bar," and Section 21(d)(5) authorizes "*any* equitable relief" in "*any* action," not just those involving scienter. As for Defendant's fallback request that the Court decide now whether a bar could issue: the facts as alleged support the request; whether the Court would determine that such equitable relief is appropriate to protect investors should await a factual record.

## II.    SUMMARY OF FACTUAL ALLEGATIONS

View makes and sells "smart" windows that automatically adjust their tinting levels in response to ambient lighting conditions. Compl. ¶ 20. Defendant joined the company as CFO in 2019 (Compl. ¶ 21), having previously spent over 25 years working in finance and operations at organizations ranging from startups to Fortune 500 companies. Compl. ¶ 48. Defendant's prior

experience included roles at KPMG, Deloitte, and Honeywell; he also worked as both the CFO and principal accounting officer of a $1 billion corporate division. Declaration of Hana M. Lauritzen ("Lauritzen Decl."), Ex, A., pg. 234 (Dkt. No. 21-2 at ECF pg. 244.). He holds an MBA in Finance and Accounting from Columbia University. *Id.*

In 2019, View identified a manufacturing defect in its windows (the "Defect" or "Defective Windows"). Compl. ¶ 22. View's warranty required the company to replace the Defective Windows but not to reimburse customers for associated installation costs ("Installation Costs"). Compl. ¶ 23. Nonetheless, upon discovering the Defect, View's leadership, including its Chief Executive Officer ("CEO") and Chief Business Officer ("CBO"), decided View would cover those costs to establish goodwill. *Id.* By early 2020, View's CBO informed Defendant of that decision (Compl. ¶ 25), which had also been discussed from 2019-2021 at executive meetings, which Defendant regularly attended. Compl. ¶ 24.

Under U.S. generally accepted accounting principles ("GAAP"), a public company should account for and disclose liabilities that are "probable" and "can be reasonably estimated." Compl. ¶ 35. Defendant was responsible for ensuring View properly accounted for and disclosed liabilities associated with the Defective Windows. Compl. ¶ 34. To that end, he assembled a team from View's accounting and finance groups to assess the company's obligations. Compl. ¶ 36. Defendant's responsibilities included ensuring the team had all necessary information and reviewing and approving the amount it decided to accrue. *Id.*

In January 2020, Defendant's team sent him an internal presentation summarizing its analysis. Compl. ¶ 37. The summary stated that a warranty liability "is a loss contingency that should be accrued if it is both probable and reasonably estimable;" that a loss contingency for the Defect was "probable" and "reasonably estimable;" and that View would therefore accrue the cost of replacing Defective Windows. *Id.* Citing the fact that View's warranty did not also cover labor, however, the presentation did not recommend accruing Installation Costs. Compl. ¶ 38. It made no mention of View's prior decision—*then known to Defendant*—to cover Installation Costs regardless of what its warranty required. Compl. ¶¶ 38-39. As a result, the presentation did not consider whether that decision made Installation Costs "probable" and "reasonably

estimable" such that they should also be included in the warranty liability. Compl. ¶ 38. Using this inadequate analysis, Defendant in April 2020 approved a $24.5 million warranty liability that excluded Installation Costs. Compl. ¶ 42.

In late 2020, Defendant asked View's CBO, who was then preparing View's 2021 budget for Installation Costs, whether View would continue covering Installation Costs. Compl. ¶43. The CBO responded affirmatively, reiterating that the company was building its market share and reputation among customers. *Id.*

In December 2020, in preparation for its subsidiary's anticipated merger with View—a transaction designed to enable View to become a public company and thus subject to U.S. GAAP—CF Financial Acquisition Corp. II ("CF II") filed a Form S-4 Registration and Proxy Statement with the SEC. Compl. ¶ 45. View supplied all of the information in the Form S-4 about its own business. *Id.* In describing the company's financial position, that document, which Defendant reviewed as CFO before it was filed, disclosed the $24.5 million liability that Defendant had previously approved. Compl. ¶ 46. Defendant failed to include Installation Costs in the disclosure, even though he knew View had decided to continue paying those costs (Compl. ¶¶ 43, 46), and even though Defendant had, by December 2020, personally approved purchase requisitions for Installation Costs, in each case doing so without asking questions about the particular circumstances of the request (Compl. ¶¶ 30-31). The proxy statements referenced Defendant over 20 times, declared he would become CFO of the merged entity, and touted his more than 25 years of experience and professional background. Compl. ¶ 48; Lauritzen Decl., Ex, A., pg. 234 (Dkt. No. 21-2 at 244.).

In January 2021, View's Controller told Defendant that View spent $3.7 million on Installation Costs in 2020. Compl. ¶ 51. One day later, the SEC asked View to amend the Form S-4 to more fully explain the warranty liability, including by addressing whether "an additional loss is reasonably possible." Compl. ¶¶ 52-54. Defendant led the team that prepared View's response. Despite having just been told the magnitude of the associated liabilities, Defendant, in the amended Form S-4, again failed to ensure that View disclosed Installation Costs, again rendering the filing materially misleading. Compl. ¶¶ 54-56.

In February and March 2021, CF II and View filed additional documents with the SEC, including a Form 8-K that Defendant signed as View's CFO, which continued to omit Installation Costs from the warranty liability. Compl. ¶¶ 58-61. Also in February 2021, Defendant incorrectly told View's independent, external auditor, PwC, that View paid Installation Costs only for some customers and only a case-by-case basis when View desired to go "above and beyond" for that customer. Comp. ¶ 57.

In April 2021, View's Controller told Defendant that View's decision to pay Installation Costs gave him "concerns around implied performance obligations." Compl. ¶ 62. A few days later, Defendant asked View's CBO whether View would continue to cover Installation Costs or could instead do so on a case-by-case basis. Compl. ¶ 63. The CBO told Defendant—yet again—that View would cover Installation Costs to protect its goodwill. *Id.* A few days later, View's Vice President of Field Operations reiterated to Defendant that View would cover Installation Costs for all customers. Compl. ¶ 64.

On May 17, 2021, View filed a Form 10-Q, which Defendant reviewed and signed as CFO. Compl. ¶¶ 66-67. Despite having received information about View's decision to cover Installation Costs repeatedly and from several sources, Defendant still failed to consider (and to ensure that View's staff considered) whether that decision made those costs probable and reasonably estimable. Compl. ¶ 65. As a result, View once again included financials that did not disclose the Installation Costs in its public filings, this time in its Form 10-Q. Compl. ¶¶ 66-67.

On November 9, 2021, View filed a Form 8-K stating that the warranty obligations it had previously disclosed were materially misstated because they excluded Installation Costs. Compl. ¶ 72. View concurrently announced that Defendant had resigned "in connection with [an] internal investigation" finding that its warranty obligations had been misstated. *Id.* In its Form 10-K for the fiscal year 2021, View announced that Defendant "and certain former accounting staff negligently failed to properly record the liabilities for warranty-related obligations and cost of Revenue" and that Defendant "and certain former accounting staff intentionally failed to disclose certain information to the Board of Directors and the Company's independent registered public accounting firm… regarding the applicable costs incurred and expected to be incurred in

connection with the warranty-related obligations." Lauritzen, Decl., Ex. E, at pg. 138 (Dkt. No. 21-6 at ECF pg. 137.). On May 21, 2022, View issued a Form 8-K that increased its 2019 warranty costs from $25 to $53 million and the 2020 costs from $23 to $48 million. Compl. ¶ 73.

### III.    ARGUMENT

#### A.  Legal Standards Disfavor Motions to Dismiss.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). Thus, "[a] motion under Rule 12(b)(6) should be granted only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief,' construing the complaint in the light most favorable to the plaintiff." *Bain v. California Tchrs. Ass'n*, 891 F.3d 1206, 1211 (9th Cir. 2018) (internal citation omitted). To satisfy Federal Rule of Civil Procedure 9(b) in securities actions, the plaintiff must plead with particularity the circumstances constituting the fraud so that the defendant can prepare an adequate answer. *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995). Alleging the "time, place and nature of the alleged fraudulent activities" satisfies this requirement. *Walling v. Beverly Enters.*, 476 F.2d 393, 397 (9th Cir. 1973).

Here, Defendant argues the SEC: (i) fails to allege negligence in support of all three pleaded claims (Section 17(a)(3) of the Securities Act, Section 14(a) of the Exchange Act, and Rule 13b2-1 of the Exchange Act); (ii) fails to allege "inherently deceptive" conduct "beyond misstatements," which he maintains Section 17(a)(3) requires; (iii) does not substantially connect Defendant's name to View's proxy solicitation efforts, as required by Section 14(a), and; (iv) improperly requests an officer and director bar in its prayer for relief. Each argument fails for the reasons set forth below.

#### B.  The Complaint Adequately Pleads Defendant's Negligence.

Defendant concedes the SEC's three claims require simple "negligence" (Mot. at 7:7-12) and that, consequently, the Complaint must plead only that he did not exercise the care "that a reasonable person of ordinary prudence would … exercise in the situation." *Id.* at 7:13-15 (internal citation omitted); *see also SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856-58 (9th Cir. 2001)

(applying "controlling standard…of reasonable prudence" for negligence-based securities claims). Defendant also does not argue the SEC's negligence allegations fail due to any heightened pleading standard.[1] Instead, he argues the Complaint fails to allege facts establishing his failure to "exercise due care" (Mot. at 9:7-14) and insists the SEC seeks to "impose strict liability" on him (*id.* at 1:18). Neither argument withstands scrutiny.

Defendant bases his arguments primarily on the unstated assumption that, if others at the company knew or should have known View was covering Installation Costs, his own failure to consider management's decision to cover those costs was blameless. Thus, Defendant argues it was "well known" (Mot. at 1:13-14) and "no secret" (*id.* at 8:9-10) that View was paying Installation Costs based on the following: (i) allegations in the Complaint purportedly establishing that View's "outside auditor and controller knew that the Company was paying" those costs (*id.* at 8:13-14); (ii) a purported determination in the SEC's settled Order against View that "the Installation Costs were reflected in the View's financial statements" (*id* at 8:15-9:3); (iii) allegations that a "Customer Success" department at View told View's customers the company would cover Installation Costs (*id.* at 8:10-12); and (iv) the absence of allegations expressly stating Defendant's subordinates did not know about management's decision (*id.* at 8:2-8).

As an initial matter, Defendant overstates his case. Taking each point in turn: (i) the cited paragraph about the auditor alleges Defendant *misled* PwC by telling it View "only paid [costs] for some customers, based on a case-by-case determination…to go 'above and beyond'"—which, as the very next sentence in the Complaint explains, "was not true." (Compl. ¶ 57); (ii) the settled Order says View's "financial statements…reflected the Installation Costs that *had been* incurred during the applicable periods" (*see* Mot. at 8:17-9:2 (quoting from SEC Order in settled action against View) (emphasis added)); it does not state, nor as Defendant suggests imply, that the financial statements reflected the decision to pay all such costs *going forward*—the critical fact for accrual purposes; (iii) the allegations about the Customer Success Department do not touch on any

---

[1] Although "[t]he Private Securities Litigation Reform Act ('PSLRA') imposes more stringent pleading requirements in private actions for securities fraud[,] the PSLRA does not apply to actions brought by the SEC." *SEC v. Mercury Interactive, LLC*, 2008 WL 4544443, at *3 n.4 (N.D. Cal. Sept. 30, 2008).

1    discussions by or knowledge of that group about management's decision to continue covering

2    Installation Costs for all customers (Compl. ¶¶ 26-31); and (iv) the Complaint clearly alleges

3    Defendant's team did *not* consider whether View's decision to cover Installation Costs going

4    forward made those costs "probable" and "reasonably estimable" (*id.* ¶¶ 37-41).

5          More important, Defendant's focus on what others knew misses the point: well-pleaded

6    allegations establish that *he* knew about management's decision and that *he* should have considered

7    (and ensured his team considered) that decision's implications for the accrual analysis. Defendant

8    attempts to minimize his involvement by emphasizing that he did not "disregard[] the advice of

9    the accounting experts" or "himself perform[] an erroneous analysis." Mot. at 7:24-26. But the

10   Complaint expressly alleges that "*Prakash* was responsible for ensuring that View properly

11   accounted for and disclosed its liabilities." Compl. ¶ 34. It also alleges specifically that he

12   "assembled" the team, "review[ed]" its work, and "approve[d]" its conclusion (Compl. ¶35), then as

13   the company's CFO, signed and certified multiple SEC submissions over many months

14   incorporating that conclusion. (Compl. ¶¶ 61, 67.) Defendant concedes he had to exercise "due

15   care" in each of those tasks. Mot. at 1:19-20. *See In re Atlas Air Worldwide Holdings, Inc. Sec.*

16   *Litig.*, 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004*)* ("As signatories to the SEC filings …, each

17   individual defendant who served as a high-level officer had a duty to familiarize himself with the

18   facts relevant to … financial reporting….").

19         And, notwithstanding Defendant's argument to the contrary, the Complaint lays out

20   precisely how he failed to satisfy his obligation to exercise due care, alleging specifically: (i) that

21   Defendant knew his team excluded Installation Costs when determining View's liabilities because

22   View's warranty terms did not require the payment of those costs (Compl. ¶ 38); (ii) that he "knew

23   or should have known" (Compl. ¶ 49) the Company *would* cover those costs, regardless of whether

24   it *had* to, undermining the reason for omitting the costs from the company's liabilities (Compl. ¶¶

25   24, 25, 43 63, 64); (iii) that the issue's importance was obvious given the amounts involved and the

26   inquiries it elicited from the SEC, View's Controller, and the company's auditor (Compl. ¶¶ 51, 52,

27   57, 62); (iv) that Defendant nevertheless, over many months and SEC filings, failed to investigate or

28   address the obvious mismatch between View's decision to cover Installation Costs and its

disclosures (Compl. ¶¶ 45-47, 56, 58, 60-61, 66-70); and (v) that as a result, View restated its financials and Defendant resigned (Compl. ¶ 72). The Court may also consider the fact of View's statement that the Company's "former Chief Financial Officer … negligently failed to properly record the liabilities for warranty-related obligations …." Lauritzen, Decl., Ex. E, at pg. 138 (Dkt. No. 21-6 at ECF pg. 137); *cf. Feola v. Cameron.*, 2016 WL 11750382, at *11 (C.D. Cal. Aug. 25, 2016) (judicially noticing statements in Form 8-K about resignation: "Although these facts are not established by the Form 8-K… their averment in that filing may be considered in connection with assessing the sufficiency of the allegations as to scienter….").

These allegations in the SEC's Complaint, accepted as true, make it not just "plausible" but certain that Defendant failed to exercise due care. *See, e.g., SEC v. Pocklington*, 2018 WL 6843665, at *3, *8 (C.D. Cal. Nov. 29, 2018) (complaint pled negligence by alleging CFO approved some expenditures he knew were improper and others he failed to investigate); *Dain Rauscher, Inc.,* 254 F.3d at 858-59 (finding triable issues regarding negligence of investment banker who relied on "assurances of other public officials" in making risk disclosures); *In re JPMorgan Chase & Co. Sec. Litig.*, 2007 WL 4531794, at *8 (N.D. Ill. Dec. 18, 2007) (denying motion to dismiss where allegations established defendants "knew or should have known" facts omitted from proxy statement); *cf. In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1274 (N.D. Cal. 2000) (holding that although "company's statements about the fired employees and their participation in…improper accounting practices" were not "direct admissions," they provided "strong circumstantial evidence" of scienter on motion to dismiss).

Defendant offers no real argument to the contrary, and the decisions he cites do not aid him. The first case he cites found after a "nine-day trial" that a CFO was not negligent in misapplying an accounting rule that, according to expert testimony, was "new and complex" and widely misunderstood. *SEC v. Jensen*, 2013 WL 6499699, at *20 (C.D. Cal. Dec. 10, 2013). No such facts appear in the Complaint here. On the contrary, the allegations describe a simple rule that turns on two factors (probability and estimability), which Defendant's team correctly applied to other costs. In any event, the Ninth Circuit vacated the decision in *Jensen*, holding that the district court improperly decided "key issues … that a jury could have resolved in the SEC's favor." *SEC v.*

1   *Jensen*, 835 F.3d 1100, 1108 (9th Cir. 2016). The only other case Defendant cites affirmed the grant

2   of judgment as a matter of law against a non-management director after "eight-and-one-half days of

3   trial" because the SEC elicited no testimony about his responsibilities or how he failed to exercise

4   due care. *SEC v. Shanahan*, 646 F.3d 536, 539, 545-46 (8th Cir. 2011). As one court noted in

5   finding the *Shanahan* decision "procedurally inapposite" on a motion to dismiss, the decision "does

6   not discuss the SEC's pleading burden, but instead the SEC's evidentiary burden at trial."

7   *Pocklington,* 2018 WL 6843665, at *8.

8        **C.  The Complaint Adequately Pleads Defendant's Violation of Section 17(a)(3).**

9        Defendant's next argument—that the SEC's claim under Section 17(a)(3) of the Securities

10  Act fails because it is based solely on "misstatements or omissions" (Mot. at 9:22-23)—fares no

11  better. Section 17(a) bars misconduct "in the offer or sale of any securities"; its three subparts

12  respectively declare unlawful: "any device, scheme, or artifice to defraud" (17(a)(1)); "obtain[ing]

13  money or property by means of any untrue statement of a material fact or…omission…." (17(a)(2));

14  and "engag[ing] in any transaction, practice, or course of business which operates or would operate

15  as a fraud or deceit upon the purchaser" (17(a)(3)). Codified at 15 U.S.C. § 77q(a). Defendant

16  argues that Section 17(a)(3) involves "scheme liability" and that the SEC must therefore allege first,

17  that he engaged in conduct "beyond alleged misstatements or omissions" and, second, that those

18  acts were "inherently deceptive." Mot. 9:17-23.

19       The Supreme Court effectively foreclosed Defendant's argument in *Lorenzo v. SEC*, ——

20  U.S. ——, 139 S. Ct. 1094 (2019), a case that appears nowhere in Defendant's brief. *Lorenzo*

21  involved an investment banker who sent but did not author emails conveying false statements to

22  two potential investors. The SEC charged him with violating Section 17(a)(1) and Rule 10b–5(a)

23  and (c), promulgated under Exchange Act Section 10(b). *Id.* at 1099-1100. Emphasizing that both

24  Section 17(a)(2) and Rule 10b-5(b) specifically create liability for any "untrue statement of a

25  material fact," the defendant argued those provisions "*exclusively* regulate[] conduct involving false

26  or misleading statements." *Id.* at 1102-03; *see also id.* at 1101 (noting the defendant's argument

27  that, "[s]imilarly, § 17(a)(2) would be the sole route for finding liability for statements under

28  § 17(a)"). Like Defendant here, he characterized the other provisions in Section 17(a) (and Rule

10b-5) as "concern[ing] 'scheme liability claims'" that "are violated only when conduct *other* than misstatements is involved." *Id.* at 1101 (emphasis added). The Supreme Court rejected that argument for three reasons: (i) the language of Section 17(a)(1) and Rules 10b-5(a) and (c) is "sufficiently broad" to bar disseminating false information; (ii) the Rule's subsections "considerabl[y] overlap," with "[e]ach succeeding prohibition … meant to cover additional kinds of illegalities;" and (iii), otherwise, "plainly fraudulent" behavior would "fall outside the scope of the Rule," undermining its "basic purpose." *Id.* at 1101-05.

Relying on *Lorenzo*, lower courts, including the Ninth Circuit, have since held that omissions and misstatements alone may support claims under Rule 10b–5(c). *In re Alphabet, Inc. Sec. Litig.,* 1 F.4th 687, 709 (9th Cir. 2021) (reversing district court for dismissing claim under Rule 10b-5(c) based on misstatements and omissions). Courts have likewise recognized that, although the Supreme Court did not directly address Section 17(a)(3) in *Lorenzo*, that provision is "virtually identical to Rule 10b-5(c)" such that "*Lorenzo*…controls on § 17(a)(3)" as well. *Malouf v. SEC,* 933 F.3d 1248, 1260 (10th Cir. 2019) (holding that a "failure to correct …misstatements could trigger liability" under Section 17(a)(3)); *SEC v. Richman*, 2021 WL 5113168, at *8 (N.D. Cal. Nov. 3, 2021) (holding that complaint adequately pleaded Section 17(a)(3) claim based on "misrepresentations to investors"); *see also Lorenzo* 139 S. Ct. at 1102 (favorably citing Commission opinion "finding violations of both §§ 17(a)(2) and (a)(3) based on "false representations"). Defendant's argument that the SEC must plead non-declarative conduct runs afoul of this authority and fails for that reason.

As the SEC need not allege *any* conduct beyond misstatements, it follows that it need not plead that such conduct was "inherently deceptive" either. In any event, Defendant's attempt to impose that requirement independently fails. For one, it cannot be squared with the plain language of Section 17(a)(3) of the Securities Act, which does not reference a "scheme" or conduct that is "inherently deceptive." Rather, the statute clearly anticipates in its plain language that violative conduct may take the form of a "transaction," or a "course of business" which would be viewed from the investor's point of view as fraudulent or misleading. 15 U.S.C. § 77q(a)(3).

This perspective is key to interpreting the *negligence*-based claim the SEC asserts here. The Supreme Court long ago held that Section 17(a)(3) "focuses upon the *effect* of particular conduct on members of the investing public," not "the culpability of the person responsible," and thus "does not require a 'showing [of] deliberate dishonesty ....'" *Aaron v. SEC*, 446 U.S. 680, 697 (1980) (internal citation omitted). Rather, liability requires only "a showing of negligence." *Dain Rauscher, Inc.,* 254 F.3d at 856. But if, as Defendant claims, Section 17(a)(3) requires "inherently deceptive" conduct, negligence would *not* be sufficient; a showing of intentional misconduct would be required. That outcome would conflict not only with Section 17(a)(3)'s language as interpreted by *Aaron*, but also with *Lorenzo*'s admonition to reject interpretations allowing violators to "escape liability … altogether." *Lorenzo*, 139 S. Ct. at 1104; *see also Pocklington*, 2018 WL 6843665, at *8 (recognizing that "it would be inconsistent … to find that Section 17(a)(3) permits negligent violations while simultaneously adopting the standard that a defendant's negligent conduct must have the 'principal <u>purpose</u> and effect' of creating a false appearance of fact").

Defendant's argument also cannot be squared with the Ninth Circuit's decision in *In re Alphabet.* The plaintiffs there asserted claims under Rule 10b–5(a) and (c) based on Google's failure to adequately disclose a security breach involving the Google+ social media platform. *See Alphabet*, 1 F.4th 687 at 694-97. Their complaint did not allege that Google+ was a sham or that Google's operation of the platform was otherwise inherently deceptive or inconsistent with legitimate business operations. On the contrary, they admitted the platform legitimately had "395 million monthly active users, more than either Twitter or Snapchat." *Id.* at 696. Thus, accepting Defendant's theory, the *Alphabet* plaintiffs' allegations should not have supported their claims. Nevertheless, the Ninth Circuit, emphasizing that *Lorenzo* "foreclosed" the argument that "Rule 10b-5(a) and (c) claims cannot overlap with Rule 10b-5(b) statement liability claims," reversed the district court's order dismissing those claims. *Id.* at 709.

The two authorities Defendant cites do not compel a different result. The first, *SEC v. Daifotis,* 2011 WL 2183314 (N.D. Cal. June 6, 2011), predates *Lorenzo*. For the proposition that what it termed "scheme" claims require inherently deceptive conduct, the *Daifotis* court relied on *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1050 (9th Cir. 2006), which considered when

defendants who did not make misstatements are aiders and abettors, for whom no private liability exists under Rule 10b-5, as opposed to primary violators. *Id.* at 1050. *Simpson* articulated the "inherently deceptive" requirement to preclude liability for those who, for example, engaged in an "arm's length non-securities transaction with an entity that then used the transaction to publish false and misleading statements"—*i.e.*, who, at most, "aided and abetted" the primary violator. *Id.* at 1050 (citing *In re Charter Commc'ns, Inc., Sec. Litig.*, 443 F.3d 987, 992 (8th Cir.2006). Even if *Daifotis* could be squared with the later, controlling authority in *Lorenzo* and *Alphabet*, it remains wholly unpersuasive here given that the SEC's Complaint *does* attribute misstatements to Defendant—for example, that View only reimbursed installation costs on a case-by-case basis. Because the Complaint also alleges only negligent conduct, and the notion that "a party can be found liable for negligently aiding or abetting negligence" is "inconsistent with fundamental legal logic" (*United States v. Hitachi Am., Ltd.*, 172 F.3d 1319, 1338 (Fed. Cir. 1999)), the concerns about aiding and abetting that animated *Simpson* do not apply here.

Defendant's second case, *SEC v. Rio Tinto*, held that *Lorenzo* did not abrogate a prior Second Circuit precedent that determined "misstatements and omissions alone are not enough for scheme liability." *Id.* 41 F.4th 47, 54 (2d Cir. 2022). To reach that conclusion, *Rio Tinto* interpreted *Lorenzo* narrowly for the proposition that, although something "extra" beyond misstatements remains necessary for liability to attach, "dissemination [of a false statement] is one example of something extra that makes a violation a scheme." *Id.* As other courts have observed, "[t]he Ninth Circuit has not adopted the 'something extra' requirement that the Second Circuit imposed in *Rio Tinto*." *SEC v. Earle*, 2023 WL 2899529, at *7 (S.D. Cal. Apr. 11, 2023). More important, *Rio Tinto*'s interpretation of *Lorenzo* conflicts with the controlling Ninth Circuit precedent, which concluded that "*Lorenzo* abrogated our contrary holding in *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057–58 (9th Cir. 2011)." *Alphabet*, 1 F.4th at 709, n.10. The "contrary holding" to which *Alphabet* refers is essentially the same principal that *Rio Tinto* determined survived—that "a defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b–5(a) or (c) when the scheme also

1  encompasses conduct beyond those misrepresentations or omissions." *Luxembourg*, 655 F.3d at

2  1057–58. *Rio Tinto* is not the law in the Ninth Circuit; it cannot aid Defendant.

3         Finally, even if *Rio Tinto's* "something extra" requirement were the controlling test, the

4  SEC's Complaint would satisfy it, for at least two reasons. First, the SEC's Complaint does not

5  merely plead that Defendant "made" statements, while leaving someone else to "disseminate" them,

6  as in *Lorenzo*, where one individual sent emails to investors that another person drafted. The SEC in

7  this case alleges Defendant made *and disseminated* false statements by misinforming auditors about

8  View's decision to cover Installation Costs for all customers. (Compl. ¶57.)  Second, the Complaint

9  describes a series of events over a more than six-month period in which Defendant failed to

10  adequately address an SEC Comment Letter, ignored repeated confirmation internally that View

11  would continue covering Installation Costs for all customers, provided incorrect information to

12  auditors, and failed to ensure his team considered information necessary to perform an accurate

13  analysis. That course of conduct and practice includes actions beyond making misstatements and

14  omissions to investors. *See, e.g., SEC v. ITT Educ. Servs., Inc*., 303 F. Supp. 3d 746, 765-66 (S.D.

15  Ind. 2018) (holding, pre-*Lorenzo*, that "the SEC has presented enough evidence of deceptive acts…

16  separate and apart from misstatements and omissions," including "deceptive acts related to the

17  information Defendants provided to auditors"); *SEC v. Wilcox*, 2023 WL 2617348, at *9 (D. Mass.

18  Mar. 23, 2023) ("the allegation that Smith provided false support to an external audit firm

19  constitutes a deceptive act that, even if related to the making of a false statement by another, may

20  establish her liability under Section 17(a)(1) and (a)(3)….").

21         **D.  The Complaint Adequately Pleads Defendant's Violation of Section 14(a).**

22         Section 14(a) of the Exchange Act prohibits any person from violating the Commission's

23  rules and regulations "to solicit or to permit the use of his name to solicit any proxy . . . in

24  respect of any security . . . registered pursuant to Section 12" of the Exchange Act. 15 U.S.C.A.

25  § 78n(a)(1). While the mere appearance of one's name in a proxy statement with little or no

26  relationship to the solicitation effort may not give rise to liability under Section 14(a), liability

27  should attach if there is "a substantial connection between the use of the person's name and the

28  solicitation effort." *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 68 (D.C. Cir. 1980) (citing

1   *Yamamoto v. Omiya*, 564 F.2d 1319, 1323 (9th Cir. 1977)). "By its express terms, Section 14(a)

2   applies not only to one who himself solicits proxies but also to anyone who 'permit(s) the use of

3   his name' in the solicitation." *Id.*

4          Defendant argues that the SEC's Section 14(a) claim fails because "[t]he Complaint fails

5   to show a substantial connection between the use of Mr. Prakash's name and the solicitation

6   effort." Mot. at 11:17-18. Defendant asserts that "courts routinely dismiss Section 14(a) claims"

7   in these circumstances. *Id.* at11:25-26. In support, Defendant cites two cases from the last 40

8   years, both from outside of this Circuit, neither of which involved an individual, like Defendant,

9   whose role in the merged entity was highlighted repeatedly in the proxy. Rather, in the cases

10  Defendant relies on, neither defendant had a particular role in the merged entity, and neither

11  stood to benefit from the proposed transaction. *Id.* at 11:25-12:3 (*citing Mendell v. Greenberg*,

12  612 F. Supp. 1543, 1552 (S.D.N.Y. 1985); *In re Bank of Am. Sec., Deriv., & ERISA Litig.*, 757 F.

13  Supp. 2d 260, 294–95. In *Mendell*, the court dismissed Section 14(a) claims against an

14  investment bank that acted as an independent professional advisor to the transaction (612 F.

15  Supp. 1543, 1552, n.1, n.3), and in *In re Bank of Am.*, the court dismissed claims against an

16  officer whose only role was to pass upon the validity of any stock issued as acquisition

17  consideration and to be the designated recipient of any notices made under the merger

18  agreement. 757 F. Supp. 2d at 294. In both cases, each court expressly noted that the defendant

19  would not benefit from the respective transactions. *In re Bank of Am.*, 757 F. Supp. 2d at 294-95;

20  *Mendell*, 612 F. Supp. at 1552.

21          In contrast, the proxy statements here, which Defendant reviewed in advance, mentioned

22  Defendant's name over 20 times; made clear to investors that Defendant would become CFO of

23  the merged entity; and highlighted his background for shareholders, including that he had over

24  25 years of global finance and operations experience in private and public organizations ranging

25  from startups to Fortune 100 companies, had previously served as the CFO and principal

26  accounting officer of a $1 billion corporate division, had previously worked at KPMG, Deloitte,

27  and Honeywell, and holds an MBA in Finance and Accounting from Columbia University.

28  Compl. ¶ 48; Lauritzen Decl., Ex, A., pg. 234 (Dkt. No. 21-2 at 244). There was thus a

1   substantial connection between the use of Defendant's name and the solicitation efforts. *See*

2   *Falstaff*, 629 F.2d at 68 (affirming district court finding that defendant was liable for Section

3   14(a) violation where his name was used 11 times in nine-page proxy, even though he was not

4   part of management of company which issued the proxy); *SEC v. Hurgin*, 484 F. Supp. 3d 98,

5   117 (S.D.N.Y. 2020) (denying motion to dismiss where SEC alleged that proxy materials

6   contained information about defendant's background, assured shareholders that he was a

7   "highly-talented industry professional" who would bring his skills to the company after the

8   merger, and invoked his name approximately 29 times). Unlike the defendants in *In re Bank of*

9   *Am.* and *Mendell¸* Prakash also had a direct and substantial interest in the proxy statement. Upon

10  consummation of the merger, Defendant was to be granted millions of restricted stock units and

11  options in View common stock. Lauritzen Decl., Ex, A., pg. 38 (Dkt. No. 21-2 at ECF pg. 48.).

12  **E.   The Complaint Properly Requests an Equitable Officer and Director Bar.**

13      Section 21(d)(5) of the Exchange Act provides that "[i]n any action …brought … by the

14  Commission under any provision of the securities laws, the Commission may seek, and any Federal

15  court may grant, *any equitable relief* that may be appropriate or necessary for the benefit of

16  investors." 15 U.S.C.A. § 78u(d)(5) (emphasis added). Consistent with that broad grant of authority,

17  the Complaint seeks an equitable order barring Defendant from "serving as an officer or director" of

18  any company with specified registration and reporting requirements. Compl. at 14.

19      Defendant insists officer and director bars are "unavailable under Section 21(d)(5)" because

20  *Liu v. SEC,* 140 S. Ct. 1936 (2020), held that statutes authorizing "equitable relief" permit courts to

21  grant only "those categories of relief that were typically available in equity." Mot. at 13:17-18.

22  Although he claims officer and director bars do not satisfy this requirement, he fails to cite a single

23  case reaching that result. Defendant instead bases his argument on the claim that, before 1990, "the

24  SEC obtained a bar in only one litigated case" and, since then, only a "small number" of cases have

25  granted that relief. Mot. at 13:14-14:1. But, from the fact that *the SEC* has obtained *this specific*

26  *relief* (*i.e*., an officer and director bar) only a "small number" of times, it hardly follows that equity

27  *courts in general* did not historically grant this *category* of relief (*i.e.*, prohibitory injunctions). *Cf.*

28  *Liu,* 140 S. Ct. at 1942-45 (broadly surveying history of equity courts "depriv[ing] wrongdoers of

their net profits," including in cases involving patent infringement, the Emergency Price Control Act of 1942, and "an interstate water compact"—regardless of how relief was described).

In any event, precedent forecloses Defendant's argument. In a case Defendant relegates to a footnote, the Ninth Circuit held that "the district court has *broad equitable powers* to fashion appropriate relief for violations of the federal securities laws, *which include the power to order an officer and director bar*." *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1193 (9th Cir. 1998) (emphasis added); *see also id.* at n.8 (emphasizing that bar fell within district court's "equitable powers to fashion appropriate relief for violations of the federal securities laws"). The Supreme Court has not overruled this holding, and Defendant does not argue that *Liu* did so implicitly. Nor could he. *Liu* and *First Pacific Bancorp* are not "clearly inconsistent" or "clearly irreconcilable"— the "high standard" for implicit abrogation (*Lair v. Bullock,* 697 F.3d 1200, 1207 (9th Cir. 2012)— considering *Liu* never mentioned officer and director bars, let alone surveyed the history of granting the category of relief to which they belong. Unsurprisingly, courts following *Liu* have continued to grant officer and director bars in settled SEC enforcement actions. *See SEC v. Hofmann*, 2021 WL 4125076, at *3 (S.D.N.Y. Sept. 9, 2021) ("pursuant to the Court's inherent equitable authority and Section 21(d)(5) of the Exchange Act…Defendant is prohibited, for five (5) years following the date of entry of this Final Judgment, from acting as an officer or director").

Defendant next argues that officer and director bars are unavailable in cases "predicated solely on negligence-based violations of the securities laws." Mot. at 13:19-14:12. Defendant identifies no case law supporting this assertion either, which conflicts with the language of Section 78u(d)(5). The statute authorizes federal courts to grant "*any* equitable relief" in "*any* action" brought by the SEC; it does not limit particular relief to particular cases. In the one case Defendant does cite (again in a footnote), the Ninth Circuit reached the opposite conclusion he urges this Court to draw. The defendant in *SEC v. Gault*, 751 F. App'x 974, 980 (9th Cir. 2018) argued, as Defendant does here, that "the SEC need[s] to prove scienter to impose an officer and director bar" and that the district court had therefore erred by granting that relief for a Section 17(a)(3) violation. *Id.* The Ninth Circuit, citing *First Pacific Bancorp*, held that his argument was "incorrect" because

"[w]e have recognized that a district court may impose an officer and director bar under its inherent equitable powers, apart from any specific statutory authority." *Id.*

As for Defendant's final invitation—to dismiss the officer and director request even in the absence of any legal infirmity, because the facts alleged in the Complaint purportedly do no support it—courts recognize that it is generally inappropriate to dismiss a prayer for injunctive relief at the pleadings stage. *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 480 F. Supp. 3d 1050, 1063 (N.D. Cal. 2020) (denying motion to dismiss SEC's request for injunctive relief as premature); *SEC v. Gabelli*, 653 F.3d 49, 61 (2d Cir. 2011) ("it is most unusual to dismiss a prayer for injunctive relief"), reversed on other grounds, 568 U.S. 442 (2013)). Dismissing the SEC's request for an officer and director bar would be particularly inappropriate here given the broad discretion the Court exercises when considering whether to grant such relief. The test most often used involves six fact-intensive considerations, all of which are non-mandatory and non-exclusive factors that "may apply." *First Pacific Bancorp*, 142 F.3d at 1193.[2] Indeed, several of the six factors typically used would support the SEC's request. Here, for example, the Court could find, consistent with the facts alleged in the Complaint, that Defendant's "role or position" as CFO of a public company is critical; that Defendant's repeated failures to correct an obvious but significant error points to the "egregiousness" of his offense; and that Defendant's refusal to accept responsibility suggests a "likelihood of misconduct" that could be repeated—all supporting the granting of injunctive relief.

The sole case Defendant cites—*SEC v. Dalius*, 2019 WL 13178869, at *10 (C.D. Cal. Sept. 12, 2019)—is not to the contrary. In *Dalius*, the court dismissed a request for disgorgement because the complaint failed to include the basic predicates for that relief: "allegations related to when, where, and how Relief Defendants received funds." 2019 WL 13178869, at *10. Here, in contrast,

---

[2] The six factors recognized by *Bancorp* are: "(1) the 'egregiousness' of the underlying securities law violation; (2) the defendant's 'repeat offender' status; (3) the defendant's 'role' or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." *Bancorp*, 142 F.3d at 1193 (internal citation omitted).

1   the Complaint lacks no such necessary factual predicates. Accordingly, Defendant's request to

2   dismiss this claim for relief should be rejected as both premature and legally unsupported.

3   **IV.    CONCLUSION**

4     As the Complaint alleges Defendant acted negligently, and its allegations, accepted as true,

5   establish the other elements of the violations the SEC asserts, as well as the relief it seeks, the SEC

6   respectfully requests that the Court deny Defendant's motion in its entirety.

7   Dated:  October 10, 2023     Respectfully submitted,

8

9           */s/ Jason Bussey*

10          Jason M. Bussey
            Attorney for Plaintiff

11          SECURITIES AND EXCHANGE COMMISSION

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28