# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

        v.

VIDUL PRAKASH,

        Defendant.

Case No.  23-cv-03300-BLF

**ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT AND GRANTING
PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT**

[Re:  ECF Nos. 199, 201]

Before the Court are Plaintiff Securities and Exchange Commission's ("SEC's") Motion for Partial Summary Judgment, ECF No. 199 ("Pl. Mot."), and Defendant Vidul Prakash's Motion for Summary Judgment, ECF No. 201 ("Def. Mot.").  Plaintiff filed an Opposition to Defendant's Motion for Summary Judgment, ECF No. 204 ("Pl. Opp."), and Reply in Support of Plaintiff's Motion for Partial Summary Judgment, ECF No. 207 ("Pl. Reply").  Defendant filed an Opposition to Plaintiff's Motion for Partial Summary Judgment, ECF No. 203 ("Def. Opp."), and Reply in Support of Defendant's Motion for Summary Judgment, ECF No. 209 ("Def. Reply"). The Court heard oral argument on both motions on October 1, 2025.  *See* ECF No. 210.

For the reasons that follow, the Court GRANTS Plaintiff's Partial Motion for Summary Judgment (ECF No. 199) and DENIES Defendant's Motion for Summary Judgment (ECF No. 201).

## I.    BACKGROUND

This case arises from View Inc.'s ("View's") allegedly erroneous accounting practices in connection with expenses associated with addressing a manufacturing defect.  The SEC seeks to hold View's former Chief Financial Officer ("CFO") Vidul Prakash liable for his alleged negligence.

1    View manufactures and sells "smart windows" that tint in response to sunlight.  ECF

2    No. 201-1, Declaration of Vidul Prakash ("Prakash Decl.") ¶ 5.  Prakash became View's CFO in

3    March 2019, when View was a private company.  *Id.* ¶ 7.  In March 2021, View went public when

4    it merged with CF Finance Acquisition Corp. II ("CF II"), a Special Purpose Acquisition

5    Company.  *Id.* ¶ 7; *see also* ECF No. 201-9, Declaration of Hanna M. Lauritzen ("Lauritzen

6    Decl.") Ex. 62.

7    View had a standard warranty for its windows, which required the company to cover the

8    cost to manufacture replacement units.  Lauritzen Decl. Ex. 26.  The warranty did not obligate

9    View to cover the shipping and installation costs ("Installation Costs").  *Id.*  However, View

10   always covered Installation Costs for customers experiencing a common defect identified in 2019,

11   known as the "Type II" defect.  *See, e.g.*, ECF No. 206, Declaration of Andrew J. Hefty in Support

12   of SEC's Opposition ("Hefty Opp. Decl.") Ex. 1 at 44:16–45:17, Ex. 4 at 59, 208:23–209:11.

13   Despite its practice of always covering Installation Costs in Type II cases, View did not accrue

14   those costs in its warranty liability.

15   View's SEC filings reflected this accounting choice until late in 2021.  *See, e.g.*, Hefty

16   Opp. Decl. Ex. 49 (Form S-4 filed on December 23, 2020, that excluded Installation Costs from

17   the disclosed warranty accrual).  In a Form 8-K filed on November 9, 2021, View explained that in

18   connection with an "independent investigation concerning the adequacy of the Company's

19   previously reported warranty accrual," View anticipated identifying "material weaknesses" in the

20   company's internal processes and taking "several remedial steps."  Hefty Opp. Decl. Ex. 65.  The

21   document further indicated that Prakash had resigned effective November 8, 2021.  *Id.*  On

22   June 15, 2022, View issued a Form 10-K for fiscal year 2021, which included restated warranty

23   liability balances as of year-end 2019, year-end 2020, and March 31, 2021.  Hefty Opp. Decl.

24   Ex. 67.  View described the previously reported warranty liability values as a "material

25   misstatement."  *Id.*

26   On July 3, 2023, the SEC initiated this action, alleging that Prakash violated

27   (1) Section 17(a)(3) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a);

28   (2) Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), *see* 15 U.S.C.

§ 78n(a), and Exchange Act Rule 14a-9, *see* 17 C.F.R. § 240.14a-9; and (3) Exchange Act Rule 13b2-1, *see* 17 C.F.R. § 240.13b2-1.  ECF No. 1 ("Compl.") ¶ 10.  The SEC seeks injunctive relief, civil penalties, and an order barring Prakash from serving as an officer or director pursuant to Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act.  *Id.* at Prayer for Relief.

Each of the SEC's claims is based on the allegation that the warranty accrual was materially misstated, and that this misstatement arose from Prakash's negligent conduct.  Prakash moves for summary judgment as to all claims, urging that the SEC (1) cannot prove its negligence claim and (2) cannot show that the alleged misstatements were material.  The SEC moves for partial summary judgment that (1) Prakash solicited or permitted the use of his name to solicit a proxy in connection with the claim under Section 14(a) of the Exchange Act; (2) Prakash used interstate commerce or the mails in connection with violations of Section 14(a) of the Exchange Act and Section 17(a)(3) of the Securities Act; and (3) the books and records at issue in this case were subject to Section 13(b)(2)(A) of the Exchange Act.

# I.    LEGAL STANDARDS

## A.    Summary Judgment

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A fact is material if it might affect the outcome of the lawsuit, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.

United States District Court
Northern District of California

3

Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Id.* On an issue for which the nonmoving party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the evidence in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may be granted. *See Liberty Lobby*, 477 U.S. at 249–50.

Once the moving party has met its initial burden, the burden of production shifts to the nonmoving party to "go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324. If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Id.* at 323.

The Court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence presented and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631. The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). If the nonmoving party fails to do so, the district court may properly grant summary judgment in favor of the moving party. *See id.*

### B.    Judicial Notice

Federal Rule of Evidence 201 provides that the Court may take judicial notice of a fact if it (1) "is generally known within the trial court's territorial jurisdiction" or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed R. Evid. 201.

## II.    PRAKASH'S MOTION FOR SUMMARY JUDGMENT

### A.    Requests for Judicial Notice

#### 1.    Prakash's Requests for Judicial Notice

Prakash requests that the Court take judicial notice of SEC filings and analyst reports. Def.

United States District Court
Northern District of California

1    Mot. at 17.  The SEC does not oppose these requests.  The Court takes judicial notice of Prakash's

2    Exhibits 91 and 96 because these documents are SEC filings, which are matters of public record

3    not subject to reasonable dispute.  *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d

4    1049, 1064 n.7 (9th Cir. 2008).  The Court takes judicial notice of Exhibits 80, 84, and 86 because

5    they are analyst reports but does not take judicial notice of the facts asserted therein.  *See In re*

6    *Century Aluminum Sec. Litig.*, No. 09-cv-1001-SI, 2011 WL 830174, at *9 (N.D. Cal. Mar. 3,

7    2011) (explaining that while "Courts routinely take judicial notice of analyst reports" it is "not in

8    order to take notice of the truth of the matters asserted therein").

9         **2.    The SEC's Requests for Judicial Notice**

10        The SEC requests that the Court take judicial notice of SEC filings, analyst reports, and

11   historical stock prices.  Pl. Opp. at 25.  Prakash does not oppose these requests.  The Court takes

12   judicial notice of SEC's Exhibits 48, 49, 50, 55, 60, 63, 65, 66, 67, and 68 because these

13   documents are judicially noticeable as SEC filings, which are matters of public record not subject

14   to reasonable dispute.  *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7

15   (9th Cir. 2008).  The Court takes judicial notice of Exhibits 80 and 81 because they are analyst

16   reports but does not take judicial notice of the facts asserted therein.  *Century Aluminum*,

17   2011 WL 830174, at *9.  Finally, the Court takes judicial notice of Exhibit 64, which lists

18   historical stock prices.  *See In re Atossa Genetics Inc. Sec. Litig.,* 868 F.3d 784, 799 (9th Cir.

19   2017).

20        **B.    Evidentiary Objection**

21        The SEC objects to Prakash's Exhibits 77 and 78 as "attorney-drafted, non-sworn

22   interview summaries that Defendant cites for the truth of what '[Rahul] Bammi is reported to have

23   said.'"  Pl. Opp. at 25.  Prakash responds that the memos are admissible under several exceptions

24   to the hearsay rule, including as recorded recollections and present sense impressions.  Def. Reply

25   at 14–15.  Prakash also argues that the exhibits are "admissible under the residual exception"

26   because they are more reliable and probative than other obtainable evidence.  *Id.* at 15.

27        Each memo begins with a paragraph explaining that it includes "attorney thoughts and

28   mental impressions that have been reorganized for clarity" and is "not merely a transcript of the

United States District Court
Northern District of California

5

discussion." Lauritzen Decl. Exs. 77, 78. As the Court explained at oral argument, the Court agrees with the SEC that the memos are inadmissible for the truth of the descriptions of what any witnesses may have said. It is not possible to disentangle attorney work product from the underlying content. Accordingly, the Court SUSTAINS the SEC's objection to Prakash's Exhibits 77 and 78.

### C.    Undisputed Facts

In 2019, shortly into Prakash's tenure as CFO, View discovered that its smart windows suffered from the so-called "Type II" manufacturing defect. Prakash Decl. ¶ 10; Lauritzen Decl. Ex. 89 at 4671, 4674–75. View's standard warranty required the company to cover the cost to manufacture replacement units but did not require View to cover Installation Costs. Lauritzen Decl. Ex. 26. Nonetheless, View covered Installation Costs for customers experiencing the Type II defect 100% of the time. *See, e.g.*, ECF No. 206, Hefty Opp. Decl. Ex. 1 at 44:16–45:17, Ex. 4 at 59, 208:23–209:11.

View's former Corporate Controller Sean Cook was the first person to analyze the issue of whether to accrue Installation Costs. In connection with that question, he prepared an "Initial Memo" in January 2020, which referenced the relevant accounting rule but did not mention Installation Costs. Lauritzen Decl. Ex. 27. Cook was fired shortly thereafter. Hefty Opp. Decl. Ex. 24. Although the details of the future of Cook's initial analysis are disputed by the Parties, an issue discussed below, it is undisputed that the internal financial team and external consultants were, at least to some extent, aware that View paid Installation Costs. Still, the company did not accrue them.

SEC filings reflected this accounting practice. On December 23, 2020, CF II filed a Form S-4 Registration and Proxy Statement in connection with the proposed merger with View. Hefty Opp. Decl. Ex. 49. It stated that View recognized $24.5 million in warranty liability—a figure that did not include Installation Costs. *Id.* On January 25, 2021, in response to an SEC comment letter seeking more information about "the additional warranty you recorded," CF II filed an amended Form S-4 that again did not include Installation Costs in the disclosed warranty liability. Hefty Opp. Decl. Exs. 50, 55. On February 16, 2021, CF II filed a Prospectus/Proxy Statement in

United States District Court
Northern District of California

connection with the merger that listed a warranty accrual which excluded Installation Costs. Hefty Opp. Decl. Ex. 51. On March 12, 2021, View filed a Current Report on Form 8-K, which disclosed the consummation of the merger between CF II and View and disclosed the $24.5 million warranty liability for the Type II defect, again excluding Installation Costs. Hefty Opp. Decl. Ex. 48. Prakash signed it as View's CFO. *Id.*

In April 2021, Cook's successor Saurabh Agarwal forwarded Prakash an email indicating that View would pay Installation Costs for all customers in the first quarter of 2021. Hefty Opp. Decl. Ex. 57. There were a couple of internal calls on the subject. On April 14, 2021, Agarwal was put on "garden leave" "due to some unfortunate circumstances." Hefty Opp. Decl. Ex. 59 (internal quotation marks omitted). Upon his departure, he alleged that he was wrongfully terminated, which led View's Audit Committee to investigate warranty-related accounting concerns. Lauritzen Decl. Ex. 79. On May 17, 2021, View filed a Form 10-Q which had been signed and certified by Prakash. Hefty Opp. Decl. Ex. 60. The Form 10-Q's stated warranty accrual still excluded Installation Costs. *Id.*

The Audit committee concluded in November 2021 that (1) the Installation Costs did not create an implied service obligation, and (2) the Audit Committee should restate its warranty-related obligations. Lauritzen Decl. Ex. 81 at 10, Ex. 83 at 2. Prakash resigned. Lauritzen Decl. Ex. 7 at 120–21. View teamed up with PwC and another consultant to straighten out the company's financials. Lauritzen Decl. Ex. 6 at 278–79. On May 31, 2022, View issued a Form 8-K with restated warranty liabilities. Lauritzen Decl. Ex. 91. View's 2019 warranty liability was listed at $53 million (previously reported as $25 million), and the 2020 warranty liability was listed at $48 million (previously reported as $23 million). *See* Lauritzen Decl. Ex. 91. On June 15, 2022, View issued a Form 10-K for fiscal year 2021, which included restated warranty liability balances as of year-end 2019, year-end 2020, and March 31, 2021. Hefty Opp. Decl. Ex. 67 at 13–14. It invited readers to "[s]ee Note 2 for discussion of the material misstatement of the previously reported warranty liability balances as of March 31, 2021 and December 31, 2020." Hefty Opp. Decl. Ex. 67 at 13–14.

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### D.    Analysis

Prakash moves for summary judgment as to each of the SEC's claims.  First, Prakash argues that the SEC cannot prove its negligence theory because it cannot show that (1) View decided to cover all Installation Costs moving forward, (2) Prakash breached his duty of care if accountants knew of View's practice of covering Installation Costs but still did not accrue those costs, or (3) Prakash's withholding of critical information was the proximate cause of the misstatements.  Def. Mot. at 17–23.  Second, Prakash argues that the SEC cannot prove the materiality of any alleged misstatement.  *Id.* at 23–24.  The SEC argues that triable issues of fact preclude summary judgment as to each of these grounds.  Pl. Opp. at 16–25.

### 1.    Negligence

Prakash argues that the SEC cannot prove its negligence theory for three independent reasons.  First, Prakash argues that the SEC cannot prove a decision was made to cover installation costs for all customers going forward, let alone communicated to Prakash.  Def. Mot. at 17–20.  Accordingly, he could not have breached his duty of care by failing to inform the finance team of a decision that was not made.  *Id.*  Second, Prakash argues that he did not breach his duty of care because the internal accounting team and external auditors knew that View had paid Installation Costs but nonetheless did not accrue those costs.  *Id.* at 20–22.  If these professionals did not accrue Installation Costs, then Prakash cannot have been found to have acted unreasonably for failing to inquire further or question their conclusions.  *Id.*  Third, Prakash argues that even if View had decided to cover all Installation Costs moving forward and even if he failed to communicate that fact to the accounting teams, the SEC cannot show Prakash's failure to disclose was the proximate cause of the alleged misstatements.  *Id.* at 22–23.

The SEC argues there is evidence sufficient to show that View decided to cover Installation Costs for all customers moving forward.  Pl. Opp. at 16–19.  Furthermore, the SEC argues that although the internal accounting team and external consultants did not accrue Installation Costs, that does not mean that Prakash did not breach his duty of care, particularly considering evidence demonstrating that the internal financial team and external auditors were not in a position to evaluate the accounting issue competently or directly.  *Id.* at 19–21.  Finally, the

SEC argues that there is evidence raising a triable issue of fact as to whether Prakash's conduct was the proximate cause of the alleged misstatements.

All three of the SEC's claims require a showing of negligence. *See SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001) ("Violations of Sections 17(a)(2) and (3) require a showing of negligence."); *In re Maxim Integrated Prods., Inc., Deriv. Lit.*, 574 F. Supp. 2d 1046, 1066 (N.D. Cal. 2008) ("The required state of mind for a § 14(a) violation is that of negligence."); *see also SEC v. Lowy*, 396 F. Supp. 2d 225, 250 (E.D.N.Y. 2003) (noting that a showing that the defendant acted unreasonably is "a prerequisite to 13b2-1 liability"). Negligence is the "failure to use the degree of care and skill that a reasonable person of ordinary prudence and intelligence would be expected to exercise in the situation." *SEC v. Hui Feng*, No. 15-cv-09420, 2017 WL 6551107, at *11 (C.D. Cal. Aug. 10, 2017), *aff'd*, 935 F.3d 721 (9th Cir. 2019) (quoting *SEC v. Schooler*, No. 12-cv-2164-GPC-JMA, 2015 WL 3491903, at *10 (S.D. Cal. June 3, 2015)); *see also Dain Rauscher*, 254 F.3d at 857 ("[T]he controlling standard remains one of reasonable prudence . . . ."). A plaintiff must also show that the harm was proximately caused by the negligent conduct. *SEC v. Rashid*, 96 F.4th 240–41 (2d Cir. 2024).

### a. Scope of the Complaint

As a threshold matter, Prakash argues that the SEC has inappropriately shifted its negligence theory from the one it pleaded in the Complaint. Def. Reply at 11–12. In particular, Prakash argues that the SEC may not rely on representation letters signed by Prakash because the "complaint says nothing about them." *Id.* at 12. Prakash further contends that the SEC's argument that he failed to "respond to red flags" is improper insofar as that theory was not alleged in the complaint. *Id.* at 11. At the hearing, the SEC argued that these additional facts are merely a continuation of the key facts and theories alleged in the complaint.

New factual allegations and claims should not be raised for the first time in an opposition to summary judgment. *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968–69 (9th Cir. 2006). This rule stems from Federal Rule of Civil Procedure 8(a)(2)'s requirement that the complaint "give the defendant fair notice of what the Plaintiff's claim is and the grounds upon which it rests." *Id.* at 968.

The Court finds that the Complaint's allegations sweep broadly, and that Prakash was on notice of the scope of the facts and arguments discussed in the SEC's opposition. It is true that the Complaint does not use the phrase "red flags" or mention "representation letters." Still, the Complaint alleges that although Prakash knew that View decided to cover all Installation Costs, he failed to ensure that others were aware of that fact when they were calculating the company's financials. *See, e.g.*, Compl. ¶ 4 ("Prakash was responsible for ensuring that View accurately disclosed the costs associated with its warranty liability . . . . He was also responsible for ensuring that View's staff who prepared the company's liability for such warranty costs had the information needed to recommend an accurate warranty liability."). The allegations also cover a substantial time period. *See, e.g.*, *id.* ¶ 55 (alleging that Prakash failed to ensure, in January 2021, "that the staff involved in preparing a response to the [SEC] Comment Letter were aware of View's actual practice and decision to cover Installation Costs"). Accordingly, the negligence theory discussed in the summary judgment briefing is sufficiently tied to the negligence theory alleged in the Complaint.

### b.  Breach of Duty of Care

Prakash argues that the SEC's negligence claims fail because the SEC cannot show that Prakash failed to use the required degree of care and skill. First, Prakash argues he cannot have failed to communicate a decision to cover all Installation Costs for all customers because the SEC cannot show that such a decision was ever made. Def. Mot. at 17–20. Second, Prakash argues that View's internal financial team and external auditors "determined" that Installation Costs should not be accrued. *Id.* at 20–21. Accordingly, Prakash argues that he cannot have breached his duty of care as a matter of law. *Id.* The SEC responds that the record reflects evidence showing that View had decided to cover all Installation Costs moving forward. Pl. Mot. at 16–19. The SEC argues that the internal financial team and external consultants are not the reasonable persons to whom Prakash should be compared when evaluating whether he breached his duty of care, because they lacked key information and perspective. *Id.* at 19–21.

To meet the negligence standard under federal securities laws, the SEC must show that a professional failed to comply with the "expansive and controlling standard of reasonable

United States District Court
Northern District of California

1    prudence, as to both investigative and disclosure obligations." *Dain Rauscher*, 254 F.3d at 856,

2    859; *see also Varjabedian v. Emulex Corp.*, No. 15-cv-00554-CJC, 2020 WL 1847708, at *10

3    (C.D. Cal. Feb. 25, 2020), *aff'd sub nom.*, *Mutza v. Emulex Corp.*, 843 F. App'x 951 (9th Cir.

4    2021) ("[N]egligence in a securities action depends on whether defendants exercised reasonable

5    prudence in their actions and inactions.").

6        As the party moving for summary judgment, Prakash has the initial burden to show that the

7    SEC cannot prove that Prakash breached his duty of care.  He seeks to do so by arguing he has

8    demonstrated an absence of record evidence showing his failure to comply with the controlling

9    standard of reasonable prudence.  In opposition, the SEC argues that it can satisfy the breach of

10   duty element with evidence showing that Prakash did not use the required degree of care because

11   he withheld critical information and failed to question the conclusions of the internal financial

12   team and external auditors.

### i.    The Alleged Decision to Cover Installation Costs

14       Each of the SEC's negligence claims is based on the allegation that Prakash did not

15   communicate View's decision to cover Installation Costs for all customers going forward.

16   Prakash argues that the SEC's negligence claims fail because "[d]iscovery has proven there was

17   no decision in late 2019 or early 2020 to cover Installation Costs for all customers going forward."

18   Def. Mot. at 18.  The SEC argues that based on View's practice of always covering Installation

19   Costs and testimony indicating that View had decided to continue that practice, whether View

20   decided to cover Installation Costs for all customers is disputed. Pl. Opp. at 16–19.  Indeed, the

21   SEC argues that evidence "overwhelmingly establishes the *relevant* decision *was* made" and that

22   Prakash knew or should have known about it.  *Id.* at 16.

23       Prakash identifies evidence that View never decided to cover Installation Costs moving

24   forward.  For example, View's CEO Rao Mulpuri testified that no decision to cover Installation

25   Costs was ever made, nor did View ever actually commit itself to paying those costs into the

26   future.  *See* Lauritzen Decl. Ex. 1 at 61, 79–80.  Other witnesses and documents reflect an

27   understanding that the payment of Installation Costs remained discretionary.  Lauritzen Decl.

28   Ex. 81 at 26381 ("The Company can, at its discretion, stop providing free labor."), Ex. 6 at 207

United States District Court
Northern District of California

11

United States District Court
Northern District of California

1   (indicating the witness's understanding that the payment of Installation Costs was discretionary).

2   "At most," Prakash argues, View's former Chief Business Officer, Rahul Bammi, testified that

3   View planned to cover Installation Costs for the following year while still acknowledging that

4   payment of those costs was discretionary.  Def. Mot. at 19 (citing Lauritzen Decl. Ex. 10 at 195–

5   96, 184–85).

6           Moreover, Prakash identifies evidence supporting the fact that even if a decision had been

7   made, it was never communicated to him.  Bammi, for example, "could not point to a single,

8   specific meeting attended by Defendant at which Bammi described his alleged plan."  *Id.* (citing

9   Lauritzen Decl. Ex. 10 at 36–38).  Furthermore, none of the seventeen fact witnesses who were

10  deposed agreed that View decided to cover Installation Costs for all customers.  Def. Mot. at 19–

11  20.  To name one, Vice President of Field Operations Daniel Purdy testified that he did not "know

12  what other people had decided" with respect to View's covering Installation Costs.  Lauritzen

13  Decl. Ex. 9 at 37:10–11.

14          The SEC does not contest that Prakash has met his initial burden of showing the absence of

15  evidence demonstrating that View decided to cover all Installation Costs moving forward.  The

16  burden shifts to the SEC to identify specific facts demonstrating the existence of genuine issues

17  for trial.

18          The SEC contends that record evidence raises a factual dispute as to whether View made

19  such a decision.  For example, in addition to the testimony quoted by Prakash, Bammi agreed that

20  View had a "policy of covering installation costs for all customers," Hefty Opp. Decl. Ex. 1

21  at 126:3–6, and explained that "Mr. Prakash and I were on the same page that the company was

22  paying for labor costs for 100 percent of the cases," *id.* at 295:23–296:1.  Bammi further testified

23  that the company intended to continue paying Installation Costs "at least for the next year."  *Id.*

24  at 196:12–13.  Documents reflect this understanding, too.  For example, View's January 2020

25  customer communication plan promised to "cover the labor costs incurred" in connection with

26  addressing the Type II defect.  Hefty Opp. Decl. Ex. 73 at 2.  Moreover, on May 9, 2020, in an

27  email to a customer, Mulpuri wrote that, "[a]lthough our warranty is generally parts-only, we are

28  replacing the units at our cost, labor included."  Hefty Opp. Decl. Ex. 74.  Furthermore, View's

practice of paying Installation Costs 100% of the time is itself evidence that View decided to cover all of those costs moving forward.

Furthermore, the SEC identifies evidence showing that Prakash knew or should have known of View's decision to cover all Installation Costs moving forward. For instance, in May 2020, Prakash was told by email that View budgeted $3.6 million in Installation Costs for each of 2020 and 2021. Hefty Opp. Decl. Ex. 44. The budgeting formula "assume[d]" that "View would cover the labor and installation costs of every customer with a type 2 defect." Hefty Opp. Decl. Ex. 4 at 94:1–5. Bammi testified that Prakash attended "staff meetings in Q3 of 2019 where the decision to cover labor and installation costs was discussed." Hefty Opp. Decl. Ex. 1 at 35:21–36:5. Moreover, the Senior Director of Sales Finance, Jing Nealis, testified that her "understanding" was that "[b]y December 2020," Prakash was "aware that the company was paying for Type II labor costs." Hefty Opp. Decl. Ex. 29 at 222:6–9. She noted that she "would update" Prakash on View's spending on various projects, so "he should be fully aware that the practice was to pay for labor." *Id.* at 222:22–223:2. As another example, in April 2021, Agarwal forwarded Prakash an email noting that "we will service 100% of the claims" in Q1 of 2021. Hefty Opp. Decl. Ex. 57. Bammi recalled a conversation from around the same time in which Prakash "was confirming if we were going to continue to cover the labor costs for replacing the IGUs" and Bammi answered, "yes, for the foreseeable future." Hefty Opp. Decl. Ex. 1 at 66:8–67:7.

On reply, Prakash seeks to contextualize the SEC's evidence, arguing it does not undermine the fact that no decision was ever made, let alone communicated to Prakash. For example, Prakash argues that the SEC fails to contend with the fact that Mulpuri was the ultimate decisionmaker on the issue of whether to pay Installation Costs. Def. Reply at 5. And his testimony did at times support the argument that the alleged decision was never made. Lauritzen Decl. Ex. 1 at 79–83. However, that Mulpuri was the ultimate decisionmaker does not mean that it is undisputed that View never made a decision to cover all Installation Costs moving forward. The SEC identifies evidence to the contrary. To name one example, the email in which Mulpuri explained that "we are replacing the units at our cost, labor included," could be understood by a

1    reasonable jury to support the claim that View had decided to continue covering Installation Costs.

2    Hefty Opp. Decl. Ex. 74.   Mulpuri described supporting a "mindset" of View's "going above and

3    beyond," including "not charging for [labor]."  Hefty Opp. Decl. Ex. 3 at 192:6–12.

4        Prakash also notes that Bammi's description of "unspecified staff meetings in Q3 2019," in

5    which Prakash could have learned of the alleged decision is "vague" and "probative of nothing."

6    Def. Reply at 6.  Vagueness does not mean the testimony is probative of nothing.  Indeed, Bammi

7    testified that he and Mulpuri made "the decision to cover labor and installation costs for the

8    foreseeable future," and discussed that decision at Mulpuri's "weekly staff meeting," attended by

9    his "direct reports," including Prakash.  Hefty Opp. Decl. Ex. 1 at 34:7–36:5.  Even if View's

10   CEO was the ultimate decisionmaker and could have decided to stop covering Installation Costs,

11   whether View decided to pay all Installation Costs for all customers moving forward is in dispute

12   given View's past practices and other evidence to the contrary.

13       In sum, drawing all inferences in favor of the SEC as the non-moving party, the Court

14   finds that a reasonable jury could conclude that a decision was made to cover Installation Costs,

15   and that Prakash knew or should have known about it.

16                    **ii.  The Accountants' Conduct**

17       Next, Prakash argues that even if the SEC could show a triable issue of fact as to whether

18   View decided to cover all Installation Costs moving forward, the SEC's negligence claims still fail

19   because the internal accounting team and external consultants understood that View was paying at

20   least some Installation Costs but nonetheless did not accrue those costs.  Def. Mot. at 20–22.

21   Because these accountants concluded Installation Costs should not be accrued, Prakash argues that

22   the SEC cannot show a breach of his duty of care as a matter of law.  *Id.*  In response, the SEC

23   argues that the controlling standard is "reasonable prudence," and not what was done by the

24   accountants in practice.  Pl. Opp. at 19–20.  The SEC argues that it is disputed whether Prakash

25   complied with his duty of care because there is evidence to support the claim that his failure to

26   inquire further about the conclusions of the accountants was unreasonable under the

27   circumstances.  *Id.*

28       The duty of care is "fixed by a standard of reasonable prudence, whether it usually is

complied with or not.'" *Dain Rauscher, Inc.*, 254 F.3d at 852, 856 (quoting *Doe v. Cutter Biological, Inc.*, 971 F.2d 375, 383 (9th Cir. 1992)).  Accordingly, mere "adherence to an industry practice or custom" is not sufficient to demonstrate that a professional has met the duty of care. *Id.*  As a consequence, courts have found that a failure to inquire further after learning about questionable accounting decisions can amount to unreasonable conduct.  *See SEC v. Espuelas*, 908 F. Supp. 2d 402, 416 (S.D.N.Y. 2012); *SEC v. Elliott*, No. 17-cv-7994-AT, 2025 WL 562507, at *8 (S.D.N.Y. Feb. 20, 2025).

Prakash explains that "[n]umerous accountants analyzed View's warranty reserve," "had access to relevant information," and still determined the Installation Costs should not be accrued. Def. Mot. at 21.  For example, in 2019, Prakash asked View's controller, Cook, to conduct an analysis with respect to the warranty reserve.  Lauritzen Decl. Ex. 8 at 64–65.  Prakash asked Cook if the "situation" with respect to the Type II defect would require View "to book a warranty reserve that was over and beyond what we booked as a general warranty reserve."  *Id.*; Lauritzen Decl. Ex. 21 (email from Prakash to Cook in which it is noted that Installation Costs were being covered "out of customer delight").  Prakash offers evidence that Cook prepared a memorandum analyzing the warranty accrual, in which he did not recommend accruing Installation Costs. Lauritzen Decl. Ex. 27.  Later, in January 2020, View's accounting team met with Prakash and presented an analysis of whether to include Installation Costs in the warranty reserve.  Lauritzen Decl. Ex. 31.  The team concluded that View should not accrue Installation Costs.  *See, e.g.*, Lauritzen Decl. Ex. 31 at 3 (concluding that View should "[a]ccrue the cost of replacing defective [Insulated Glass Units] at the low end of the range" excluding Installation Costs).  View also hired an outside accounting team, Effectus Group, LLC ("Effectus").  According to Prakash, "Effectus was expressly asked to review View's warranty reserve."  Def. Mot. at 8.  And by January 2020, Prakash had come away from a series of communications that followed with an understanding that Effectus agreed with View's internal accountants that the company should not accrue Installation Costs.  Prakash Decl. ¶ 16; *see also* Lauritzen Decl. Ex. 35.

In February 2020, Cook's successor Saurabh Agarwal started work at View as the Vice President of Finance and Corporate Controller.  Lauritzen Decl. Ex. 38.  Over the next year,

Agarwal approved View's warranty reserve, and the Company continued to exclude Installation Costs.  PwC also audited the Type II warranty reserve in March 2020 with the "understanding that the warranty accrual did not contain costs related to installation and labor and freight and related to those and replacement windows."  Lauritzen Decl. Ex. 4 at 64:12–15.  Following that audit, View booked a warranty reserve of roughly $24.5 million in connection with the Type II defect—a value that excluded Installation Costs.  Lauritzen Decl. Ex. 48.  Another outside accounting firm, KMP Associates LLC ("KMPA), was told that Installation Costs were being paid but not included in the warranty accrual.  Lauritzen Decl. Ex. 52.  One member of the internal accounting team testified that KMPA "reviewed" View's "updated financial reporting."  Lauritzen Decl. Ex. 3 at 241:24–25.  She further testified that if KMPA had felt the accounting was "wrong" in some way, then View could not have "pass[ed]" the review.  *Id.* at 241:24–242:3.  As a consequence, she testified that KMPA had "obviously" "agreed" with View's accounting practices.  *Id.* at 242:2–3.  As View prepared to become public in the fall of 2020, PwC conducted another audit and discussed the warranty reserve with internal accountants and KMPA.  Lauritzen Decl. Ex. 61. PwC concluded in December 2020 that the financial statements "present[ed] fairly, in all material respects, the financial position of the Company as of December 31, 2019[,] and 2018."  Lauritzen Decl. Ex. 62.

The SEC does not contest that Prakash has met his initial burden to show an absence of evidence in the record supporting the claim that he failed to use the required degree of care and skill.  The burden shifts to the SEC to show a triable issue of material fact.

The SEC outlines evidence, that, it argues, creates a factual dispute as to whether Prakash breached his duty of care, whatever the internal finance team and external accountants may have done.  For example, the SEC identifies evidence showing that none of the individuals upon whom Prakash relied was similarly situated or had sufficient information.  Cook, for instance, "did not consider [him]self a technical accountant."  Hefty Opp. Decl. Ex. 18 at 26:16–17.  The memorandum he produced did not expressly mention Installation Costs or how to account for them.  Hefty Opp. Decl. Ex. 25.  Cook was fired shortly after conducting his analysis and did not transition his work to anyone else before leaving the company.  Hefty Opp. Decl. Ex. 18 at 46:21–

United States District Court
Northern District of California

47:14.  Although the internal finance team met with Prakash to go over Cook's initial analysis, the SEC points to evidence demonstrating that the team neither had the technical skills to competently determine whether Installation Costs should expense or accrue, nor took responsibility for independently researching that issue.  *See, e.g.*, Hefty Opp. Decl. Ex. 23 at 226:8–12, 23–25 (former member of View's accounting team testifying that she never assumed responsibility for completing the memo or confirming its accuracy), Ex. 26 at 19–20, 90–91 (View employee had an inactive CPA license and did not consider herself responsible for the analysis in the memo).  Moreover, the team apparently did not know how often View was paying Installation Costs.  *See, e.g.*, Hefty Opp. Decl. Ex. 28 at 78:25–79:2 ("[M]y understanding was that we paid some, but to what extent, I had no idea.").  PwC flagged that View's lack of "personnel with an appropriate degree of accounting knowledge and experience to appropriately analyze, record and disclose accounting matters commensurate with the Company's accounting and reporting requirements" was a "material weakness."  Hefty Opp. Decl. Ex. 47 at 4, 10 (December 23, 2020, audit letter from PwC).  Cook's successor Agarwal was "specifically told" by Prakash that the company was paying Installation Costs on a "case-by case basis,"  Hefty Opp. Decl. Ex. 36 at 127:8–13, and no one requested that he conduct Cook's initial accounting analysis anew, *id.* at 83:12–24.

The SEC also highlights evidence demonstrating that Effectus, PwC, and KMPA never directly confronted the question of whether the Installation Costs should accrue, although View did repeatedly engage outside consultants.  While Prakash may have believed that Effectus approved View's accrual, there is evidence showing that Effectus never addressed that question.  *See, e.g.*,  Hefty Opp. Decl. Ex. 31 at 24:21–25:5, Ex. 32 at 285:12–18.  KMPA likewise was engaged to analyze questions other than whether Installation Costs should be accrued.  Hefty Opp. Decl. Ex. 37 at 38:16–39:9.  The SEC identifies evidence reflecting the claim that PwC was never explicitly told that the company had been and intended to continue paying Installation Costs, or that those costs were excluded from the warranty accrual.  Hefty Opp. Decl. Ex. 40 at 275:8–280:5, Ex. 41.

The SEC also offers evidence demonstrating that Prakash ignored (or perhaps affirmatively sought to sweep under the rug) a series of "red flags."  Pl. Opp. at 11.  The red flags mostly

17

1    revolve around concerns raised by Agarwal.  As an example, on January 18, 2021, Agarwal

2    suggested the accrual might be inaccurate because View was paying Installation Costs.  *See* Hefty

3    Opp. Decl. Ex. 53.  The following day, View received a comment letter from the SEC in

4    connection with View's December 23, 2020, Form S-4.  Hefty Opp. Decl. Ex. 55.  Although the

5    letter inquired about "the specific facts and circumstances related to the additional warranty you

6    recorded," *id.* at 3, Prakash, according to some witnesses, dismissed out of hand the idea that View

7    would pay Installation Costs for all customers, Hefty Opp. Decl. Ex. 36 at 198:23–201:21.  View's

8    warranty accrual continued to omit installation costs.  *See, e.g.*, Hefty Opp. Decl. Ex. 50.  There is

9    also evidence that Prakash affirmatively told PwC that View paid Installation Costs only

10   selectively.  Hefty Opp. Decl. Ex. 36 at 219:23–24:23, Ex. 40 at 323:24–324:3 ("My

11   understanding, based on the response from Mr. Prakash, was that [Installation] [C]osts were being

12   incurred on a case-by-case basis . . . .").

13        Prakash argues that this case is like *SEC v. Rashid*, 96 F.4th 233 (2d Cir. 2024).  Def. Mot.

14   at 21–22.  There, the court concluded the defendant did not breach his duty of care because other

15   employees had reached the same conclusion as him with respect to financial decisions.  *Id.* at 241.

16   The court further explained that the defendant's colleagues were "the 'reasonable persons' against

17   whom [he] should be compared when evaluating" his decision-making.  *Id.*  Prakash argues that,

18   as in *Rashid*, he cannot be negligent as a matter of law when measured against the internal and

19   external consultants who came to the same conclusion that he did.

20        The SEC argues *Rashid* is inapposite because Prakash was uniquely situated and oversaw

21   an internal financial team that lacked expertise and information, and external consultants who

22   were never asked to evaluate the warranty accrual issue directly.  Pl. Opp. at 19–20.  In *Rashid*,

23   the defendant's colleagues each "owed . . . similar fiduciary duties as" the defendant.  *Rashid*,

24   96 F.4th at 241.  The Court agrees that *Rashid* distinguishable.  Unlike in *Rashid*, the evidence

25   offered by the SEC, which a reasonable jury could credit, demonstrates that the internal

26   accountants and external consultants were differently situated and did not owe View duties

27   comparable to those owed by Prakash.  The internal employees were subordinate to Prakash and,

28   as described above, there is evidence showing that these internal financial employees did not have

18

United States District Court
Northern District of California

1  the training or information to competently address the question of whether Installation Costs

2  should accrue.  The SEC also identifies evidence showing that Prakash was unreasonable in

3  relying on the accounting team's "expertise": he was repeatedly put on notice of the fact that

4  View's lack of internal accounting knowledge amounted to a "material weakness."  *See, e.g.*,

5  Hefty Opp. Decl. Ex. 47 at 4, 10; Hefty Opp. Decl. Ex. 56 at 10, 17.  The internal accounting team

6  also saw significant turnover.  Moreover, there is evidence illustrating that the outside consultants

7  were not asked to, and did not have the information to, evaluate the warranty accrual issue

8  properly.

9       Prakash argues that the SEC "seem[s] to misunderstand that it bears the burden of proof,"

10  and cannot prevail "based simply on a claim that the accounting was wrong."  Def. Reply at 8.

11  The Court agrees that the claims are not strict liability offenses, and the jury may well not be

12  persuaded that Prakash breached his duty of care.  However, the Court finds that the SEC has

13  identified evidence upon which a reasonable jury could rely to conclude that Prakash's failure to

14  conduct further inquiry into the warranty accrual issue or further inform the accountants

15  addressing the question was a breach of his duty of care.  *See Elliott*, 2025 WL 562507, at *8

16  (declining to grant summary judgment where a reasonable jury could find that the defendant

17  breached his duty of care by failing to push back on the conclusions in accounting papers).  For

18  example, a jury could reasonably rely on Prakash's failure to follow up on the accuracy of Cook's

19  "initial memo," especially in light of the turnover on the internal financial team, or Prakash's

20  declining to dig deeper upon receipt of the SEC comment letter, to conclude that he breached his

21  duty of care.

22       Drawing all inferences in favor of the SEC, the Court finds there "are genuine issues of

23  material fact as to what is the appropriate industry standard, whether [Prakash] complied with that

24  standard and, more importantly, whether he complied with the more expansive and controlling

25  standard of reasonable prudence, as to both his investigative and disclosure responsibilities."  *Dain*

26  *Rauscher*, 254 F.3d at 859.

27       **c.  Proximate Cause**

28       Prakash further argues that even if View had decided to cover all Installation Costs going

1    forward, he would still prevail because the SEC cannot prove that his breach of duty was a

2    proximate cause of the alleged misstatements.  Def. Mot. at 22–23.  Prakash argues that both

3    Parties' experts agree that whether View was required to accrue Installation Costs did not turn on

4    whether there was a decision to cover all of those costs moving forward.  *Id.*  Accordingly, he

5    argues that the misstatement could not have been caused by Prakash's alleged breach because the

6    finance teams knew *some* Installation Costs were being paid.  The SEC responds that Prakash

7    mischaracterizes expert testimony and the facts.  Pl. Opp. at 21–23.  The SEC argues that there is

8    evidence creating a factual dispute as to whether Prakash's withholding critical information was a

9    proximate cause of the alleged misstatements.  *Id.*

10    Proximate cause is established when the allegedly negligent act is a "substantial factor" in

11    bringing about the result—here, the alleged misstatements.  *SEC v. Murphy*, 626 F.2d 633, 650

12    (9th Cir. 1980).  Thus, the issue is whether Prakash's failure to ensure that his internal and

13    external teams considered View's decision to pay Installation Costs into the future was a

14    substantial factor leading to the company's financial misstatements.  As the party moving for

15    summary judgment, Prakash has the initial burden to show that the SEC cannot prove that View's

16    misstatements were proximately caused by his alleged failure to use the required degree of care

17    and skill.

18    Prakash submits expert testimony demonstrating that whether View *should* have accrued

19    for the Installation Costs did not turn on whether there was a decision to pay all Installation Costs

20    moving forward.  Prakash relies on the SEC's expert, who testified that even if View was paying

21    Installation Costs only on a case-by-case basis, View should still accrue them.  Lauritzen Decl.

22    Ex. 15 at 144:15–17.  Accordingly, so long as the accountants knew that *some* Installation Costs

23    were being paid and still decided not to accrue for them, then Prakash's failure to communicate

24    View's decision to pay *all* Installation Costs would not have been the proximate cause of the

25    erroneous accounting.  Moreover, Prakash's expert concluded that View had no obligation to

26    accrue the Installation Costs absent "an explicit or implicit promise that created a valid expectation

27    for its Customer Base that View would cover such costs."  ECF No. 201-2, Declaration of Howard

28    A. Sheck ("Sheck Decl.") Ex. B ¶ 13.  Thus, according to Prakash's expert, whether View was

United States District Court
Northern District of California

20

United States District Court
Northern District of California

1    required to accrue turned on its liability, not its intent.

2           The SEC does not dispute that Prakash has met his initial burden.  Thus, the burden shifts

3    to the SEC to show the existence of record evidence on which a reasonable trier of fact could rely

4    to conclude that Prakash's conduct was the proximate cause of the alleged harm.

5           In response, the SEC points to evidence in the record raising a triable issue of fact as to

6    whether "the failure to consider View's intent to pay all costs" was a proximate cause of the

7    company's alleged misstatement.  Pl. Opp. at 21.  While the SEC's expert indeed testified that a

8    decision to cover all costs is not necessary for a company to be required to accrue some costs, the

9    same expert also opined that "View should have recorded a liability for the costs *they intended to*

10   *pay*."  ECF No. 205, Declaration of Gerald Fujimoto ("Fujimoto Decl.") Ex. A ¶ 42 (emphasis

11   added).  Moreover, the SEC points to lay testimony indicating that "because [View] was incurring

12   [Installation Costs] a hundred percent of the time and had the intention of incurring them a

13   hundred percent of the time," View would be required to accrue.  Hefty Opp. Decl. Ex. 40

14   at 169:18–172:14 (testimony of View's auditor).  View's Audit Committee Chair believed the

15   relevant calculation "straightforward" when it was clear that the company was covering all

16   Installation Costs.  Hefty Opp. Decl. Ex. 71 at 146:7–14.

17          The Court concludes that the disputed evidence identified by the SEC, if credited, would

18   support a finding a proximate cause.  Indeed, the SEC identifies evidence demonstrating that the

19   accounting teams were unable to competently evaluate the question of whether Installation Costs

20   should accrue because Prakash withheld crucial information.  The internal financial team and

21   external accountants lacked the expertise, the information, or the relevant framing to analyze the

22   issue properly.  Moreover, the SEC identifies evidence of discontinuity of the internal team.  Had

23   these internal and external individuals known that View decided to pay all Installation Costs

24   moving forward, perhaps it would have become clear to those involved that View should accrue

25   those costs.  *Id.* ("I think the calculation of the accrual became straightforward when it was clear

26   that we were paying for all the labor.").  Although the SEC's evidence is sparse, the Court finds

27   that the SEC has submitted sufficient evidence to show a dispute of material fact.  A reasonable

28   jury could conclude that Prakash's alleged failure to convey View's decision to cover all

1    Installation Costs to the accounting team was a proximate cause of the alleged misstatement.

2        **2.    Materiality**

3        Prakash argues that the SEC cannot show materiality because expert testimony establishes

4    that Installation Costs were not a substantial percentage of View's operating costs, nor would

5    coverage of those costs have led to a significant decline in View's stock.  Def. Mot. at 22–23.  The

6    SEC argues that the issue of materiality is disputed because expert testimony supports linking

7    declines in View's stock to warranty-related disclosures.  Pl. Opp. at 23–25.  A misstatement is

8    material if there is a "substantial likelihood that the disclosure of the omitted fact would have been

9    viewed by the reasonable investor as having significantly altered the 'total mix' of information

10   made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988).

11       As the moving party, Prakash has the initial burden to show that the SEC cannot satisfy the

12   materiality element.  If he can so demonstrate, the burden will shift to the SEC to identify

13   evidence that raises a genuine factual dispute for trial.

14       In support of his argument, Prakash points to his expert's report, which explains that the

15   Installation Costs "were not significant relative to View's financial condition" and "valuation"

16   "from an investor's perspective."  ECF No. 201-6, Declaration of Expert David J. Denis in

17   Support of Defendant's Motion for Summary Judgment ("Denis Decl.") Ex. B ¶¶ 11–12.  Denis

18   explains that the Installation Costs were between one and two percent of View's operating costs.

19   *Id.* ¶ 31.  Prakash also notes that analysts opined at that time that even if the warranty liability

20   "double[d], this would be entirely manageable financially."  Lauritzen Decl. Ex. 80.

21       The SEC does not dispute that Prakash has met his initial burden.  Accordingly, the burden

22   shifts to the SEC to show a material issue of disputed fact.

23       The SEC points to its expert's opinion to raise a triable factual issue.  The SEC's expert

24   conducted an event study, Hefty Opp. Decl. Ex. 70 ¶¶ 11–12, which revealed statistically

25   significant stock price declines following View's warranty-related disclosures, *id.* ¶¶ 26–32.  The

26   SEC's expert concluded "the disclosures of the misreported warranty liabilities had a negative

27   impact on the company's stock price."  *Id.* ¶ 6.  The SEC further points to its expert's identifying

28   errors in the approach of Prakash's expert.  Hefty Opp. Decl. Ex. 79.  Finally, the SEC argues that

1    *other* contemporaneous analyst reports show that the announcements were an area of concern for

2    investors.  *See, e.g.*, Hefty Opp. Decl. Ex. 80.

3         On reply, Prakash argues that the event study "does not support materiality" for a number

4    of reasons, including because there were confounding factors.  Def. Reply. at 12–13.  The Court

5    finds that Prakash's attacks on the credibility of the opinion of Prakash's expert is an issue not

6    properly considered at the summary judgment stage.  *United States v. Union Pac. R.R.*,

7    565 F. Supp. 2d 1136, 1150 n.22  (E.D. Cal. 2008) ("Challenges to an expert's substantive

8    opinions are the proper subject of cross-examination; such issues are not appropriate for resolution

9    on summary judgment.").

10        A reasonable jury could conclude that the misstated warranty accrual was material.

11   Drawing all inferences in favor of the SEC, there is a dispute among experts as to the key issue:

12   whether the alleged misstatements were material.  Prakash's expert says the Installation Costs

13   were not significant to investors.  The SEC's expert attributes various drops in View's stock price

14   to disclosures related to the Installation Costs, which, in turn, supports a finding that the alleged

15   misstatements were material.  The differing analyst reports submitted by the parties likewise raise

16   a contested factual issue.  In light of the material facts in dispute, the Court concludes that this is

17   not an appropriate case in which to deviate from the general rule that materiality "should

18   ordinarily be left to the trier of fact."  *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007).

19   **III.    THE SEC'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

20        **A.    Requests for Judicial Notice**

21        The SEC requests that the Court take judicial notice of documents filed on the SEC's

22   Electronic Data, Gathering, Analysis, and Retrieval ("EDGAR") website.  Pl. Mot. at 17–18; Pl.

23   Reply at 12.  These requests are unopposed.  As explained above, SEC filings are proper subjects

24   of judicial notice.  *See Metzler Inv. GMBH*, 540 F.3d at 1064 n.7.  Accordingly, the Court takes

25   judicial notice of the exhibits

26        **B.    Undisputed Facts**

27        Shortly after Prakash began work as View's CFO, the company discovered that its smart

28   windows had a manufacturing defect, namely the Type II defect.  ECF No. 200, Declaration of

1    Andrew J. Hefty in Support of SEC's Motion for Partial Summary Judgment ("Hefty Mot. Decl.")

2    Ex. 2 at 10:22–11:4, Ex. 3 at  28:1–29:20.  View's standard warranty covered the purchase price

3    of the smart windows, but not the "Installation Costs" (labor, shipping, or other costs).  Hefty Mot.

4    Decl. Ex. 3 at 21:3–25:4.  Still, View covered Installation Costs for customers experiencing this

5    defect 100% of the time.  Hefty Mot. Decl. Ex. 3 at 59:8–59:18.

6         In SEC filings submitted between December 2020 and May 2021, View disclosed a

7    warranty liability that excluded View's projected Installation Costs and included only the costs to

8    manufacture replacement windows.  *See, e.g.*,  Hefty Mot. Opp. Ex. 1 at 236, Ex. 7 at 228–29,

9    Ex. 8 at 236, Ex. 9 at 236, Ex. 10 at 20–21, Ex. 11 at 82–83, Ex. 12 at 12.  This alleged

10   misstatement—the disclosed warranty accrual that excluded Installation Costs—is the basis for

11   each of the SEC's claims against Prakash.

12        In November 2020, View and CF II (a special purpose acquisition company) entered into a

13   Merger Agreement.  *See* Hefty Mot. Decl. Ex. 13.  The transaction required approval of the

14   shareholders of both CF II and View.  *Id.* at 2.  Accordingly, in December 2020, CF II filed a

15   Form S-4 in connection with the transaction.  Hefty Mot. Decl. Ex. 7.  It included a "Preliminary

16   Proxy Statement/Prospectus.  *Id.*  Prakash's name appears 23 times throughout the roughly 600-

17   page-long document.  *Id.*  It notes that Prakash will continue to serve as CFO following the close

18   of the transaction.  *Id.* at 240.  It also lists information about Prakash's professional biography,

19   including his more than "25 years of global finance and operations experience in private and

20   public companies."  *Id.* at 234.  Prakash reviewed drafts of the Form S-4 prior to filing.  Hefty

21   Mot. Decl. Ex. 2 at 320:5–12; Ex. 15 at 172:21–173:16, Ex. 16.

22        An amended Form S-4 containing similar information about Prakash's credentials and role

23   in the post-transaction company was filed in January 2021.  *See* Hefty Mot. Decl. Ex. 8.  On

24   February 16, 2021, CF II filed the Prospectus/Proxy Statement.  Hefty Mot. Decl. Ex. 1

25   ("Prospectus/Proxy Statement").  The document is also about 600 pages, references Prakash by

26   name more than 20 times, includes his professional biography and compensation information, and

27   states that he "will" serve as View's CFO following the conclusion of the transaction.  *See, e.g.*,

28   Prospectus/Proxy Statement at 241, 247–248.  That View's "Experienced Management Team"

24

"will continue" to lead the company following the transaction is listed among "CF II's Reasons for the Business Combination." *See* Prospectus/Proxy Statement at 25–26.  When the transaction closed, View began publicly trading on the Nasdaq Stock Market.  Hefty Mot. Decl. Ex. 11 at 54. Prakash was serving as View's CFO.  *Id.* at 104.

### C.    Analysis

The SEC moves for partial summary judgment as to three issues.  First, the SEC argues there is no factual dispute that Prakash solicited or permitted the use of his name to solicit votes for View's merger with CF II, a showing required under Section 14(a) of the Exchange Act.  Pl. Mot. at 8–12.  Second, the SEC argues it is undisputed that Prakash used interstate commerce or the mails in connection with violations of Section 14(a) of the Exchange Act and Section 17(a)(3) of the Securities Act.  *Id.* at 13–15.  Third, the SEC argues there is no factual dispute that the allegedly falsified books and records were subject to section 13(b)(2)(A) of the Securities Exchange Act.  *Id.* at 15–16.

Prakash argues that there is a factual dispute as to whether he permitted the use of his name in connection with the solicitation effort.  Def. Opp. at 6–10.  He does not contest that the interstate commerce element of the SEC's Section 14(a) and Section 17(a)(3) claims is satisfied. He likewise does not contest that the books and records in this case were subject to Section 13(B)(2) of the Exchange Act.

### 1.    Whether Prakash Solicited or Permitted the Use of His Name to Solicit Proxies

The SEC argues that there is no dispute that there is a substantial connection between the use of Prakash's name and the solicitation effort.  Pl. Mot. at 8–12.  Prakash asserts that the SEC fails to establish this element by undisputed evidence because it has not provided proof that Prakash's name "induced shareholders" to grant the proxy.  Def. Opp. at 6–10.

Under Section 14(a) of the Exchange Act, it is "unlawful for any person to solicit or *to permit the use of his name to solicit* any proxy or consent or authorization in respect of any security . . . registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a) (emphasis added). In the Ninth Circuit, liability attaches only where there is a "substantial connection between the

use of the person's name and the solicitation effort." *Yamamoto v. Omiya*, 564 F.2d 1319, 1323 (9th Cir. 1977).  As the party moving for summary judgment, the SEC has the initial burden to show that the undisputed evidence demonstrates that there was a substantial connection between the name and the solicitation effort.

The parties dispute the relevant legal test.  Prakash argues that *Yamamoto*'s "substantial connection" test "imposes a prerequisite to Section 14(a) liability, namely, "proof that person's name induced shareholders to grant their proxy." Def. Opp. at 7 (citing *Yamamoto*, 564 F.2d at 1323).  The SEC argues that the "proof of inducement" requirement described by Prakash is a "novel legal standard" with no foundation in the text of Section 14(a) or the caselaw.  Pl. Reply at 3–4.

*Yamamoto* centered on a company's decision to sell its principal asset—a building. *Yamamoto*, 564 F.2d at 1321–22.  The Ninth Circuit held that the building's purchaser could not be held liable for errors in the proxy statement, although his name and address appeared in the proxy statement as the proposed buyer.  *Id.* at 1322–23.  The court observed that his name appeared only twice and was confined to a single paragraph of text.  *Id.* at 1322 n.7.  The Ninth Circuit held that the "mere presence of [the person's] name in the materials" did not demonstrate "any significant control" by the individual over the statement, nor was his "adoption" of the statement "sufficient to justify attaching liability to him."  *Id.* at 1323.  Moreover, it "is hardly conceivable" that the "mere revelation" that the individual was the proposed buyer "could have been an inducing factor in the granting of a shareholder's proxy."  *Id.*  The *Yamamoto* court held that liability attaches only where there exists "a substantial connection between the use of the person's name and the solicitation effort."  *Id.*

While "the simple appearance of one's name in a proxy statement does not trigger liability for any misstatement appearing therein,"  *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 68 (D.C. Cir. 1980), *Yamamoto*'s test is an objective one.  The inquiry is not whether shareholders were actually induced to take an action as a result of the use of the name.  Rather, the question is whether the person permitted his name to be used in the solicitation materials and whether there was a substantial connection between the use of the name and the solicitation effort.  Accordingly,

26

1    the Court finds that Prakash's test that "an essential prerequisite to Section 14(a) liability" is

2    "proof that person's name induced shareholders to grant their proxy" is contrary to the objective

3    "substantial connection" test outlined by the *Yamamoto* court.

4         Courts have found a substantial connection between the use of the defendant's name and

5    the solicitation effort where the defendant has put his reputation at issue.  In *Falstaff*, the Court

6    found the defendant had a substantial connection to the transaction where the shareholder votes

7    would approve his taking control of the company, which, in turn, made his "reputation," "plans"

8    for the company, and "other dealings" "important to the existing shareholders."  *Id.* at 69; *see also*

9    *In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*,

10   757 F. Supp. 2d 260, 294 (S.D.N.Y. 2010) ("When individuals listed in a proxy statement have put

11   their reputations in issue, they cannot divorce themselves from improper actions taken in the proxy

12   battle by the participants acting under the banner of their names.") (internal quotation marks

13   omitted).  Likewise, in *In re Lottery.com, Inc. Security Litigation*, the court found a substantial

14   connection where the defendants' names appeared between twenty-three and thirty-eight times and

15   contained information about each of the defendant's "qualifications, experience, and their roles in

16   the company following" the transaction at issue.  765 F. Supp. 3d 303, 363 (S.D.N.Y. 2025).  As a

17   consequence, the court found that the defendants had put their reputations at issue.  *Id.*

18        Prakash points the Court to *SEC v. Hurgin*, No. 19-cv-5705-MKV, 2022 WL 4448561

19   (S.D.N.Y. Sept. 23, 2022).  Def. Opp. at 7.  There, the court denied a motion for summary

20   judgment on a Section 14(a) claim on the ground that there was a question of fact as to whether

21   there was a "substantial connection" between the defendant's name and the solicitation effort.  *Id.*

22   at *12.  But that finding was made in connection with consideration of other disputed facts,

23   including whether the defendant had reviewed the proxy statement or knew the underlying

24   statements were misleading.  *Id.* at *11–12.

25        Here, the Court concludes that the undisputed facts demonstrate that under the objective

26   test set out in *Yamamoto* there is a substantial connection between Prakash's name and the

27   solicitation effort.  It is undisputed that Prakash reviewed drafts of the solicitation materials.  *See,*

28   *e.g.*, Ex. 16.  It is also undisputed that, like in *Lottery.com* where the defendants' names appeared

dozens of times, Prakash's name appeared twenty-three times in the Prospectus/Proxy statement. *See* Prospectus/Proxy Statement.  Moreover, the statement included Prakash's biography, noting his "25 years of global finance and operations experience."  Prospectus/Proxy Statement at 249.  It further stated that Prakash "will" serve as the CFO upon the close of the transaction. Prospectus/Proxy Statement at 255.  As a consequence, the references to the "Experienced Management Team" throughout the document all reference Prakash.  *See, e.g.*, Prospectus/Proxy Statement at 26, 140, 146.  The statement also lists Prakash's compensation (in addition to that of other View executives) in 2019 and 2020.  Prospectus/Proxy Statement at 249.  Accordingly, like the defendant in *Falstaff* whose "reputation as a businessman" and "plans" for the company were "important to existing shareholders," Prakash put his reputation at issue in the proxy materials by including his professional biography, prior leadership role in View, and continued executive position following the merger as reasons why a shareholder should approve the transaction. *Falstaff*, 629 F.2d at 69.  Unlike in *Yamamoto*, where the Court held that a person's name mentioned only twice in a single paragraph of text did not give rise to the required "substantial connection" between the name and the solicitation effort, here, Prakash's name, reputation, and experience were put forth prominently in the Prospectus/Proxy Statement.  *Yamamoto*, 564 F.2d at 1322 n.7.  Accordingly, the SEC's evidence is sufficient to establish that there was a "substantial connection" between Prakash's name and the solicitation effort.  *Id.* at 1323.  The Court finds that the SEC has satisfied its initial burden to show that Prakash permitted the use of his name to solicit a proxy.

The SEC has met its initial burden to show a substantial connection between Prakash's name and the solicitation effort.  Prakash does not submit any additional evidence creating a dispute of material fact in connection with this issue.  Accordingly, the Court concludes that no reasonable jury could find that Prakash did not permit his name to be used in the solicitation effort.  The Court will grant partial summary judgment as to this element of the Section 14(a) claim.

### 2.    Use of Means or Instruments of Interstate Commerce or the Mails

To prevail on its claims under Section 17(a)(3) of the Securities Act and Section 14(a) of

28

the Exchange Act, the SEC must show that Prakash used means of interstate commerce or mails when violating those provisions.  The SEC argues judicially noticeable facts establish this element.  Pl. Mot. at 13–14.  Prakash does not oppose summary judgment on this issue.  Def. Opp. at 10.

The Court has taken notice of facts showing that financial data underlying the SEC's claims were included in filings published online in the relevant time period.  Accordingly, the Court finds that Prakash used means of interstate commerce or the mails and will grant partial summary judgment on this issue.  *United States v. Sutcliffe*, 505 F.3d 944, 952–53 (9th Cir. 2007).

### 3.    View's Books, Records, and Accounts

The SEC asserts that Prakash violated Rule 13b2-1 of the Exchange Act, which prohibits "directly or indirectly, falsify[ing] or caus[ing] to be falsified, any book, record or account subject to section 13(b)(2)(A) of the Securities Exchange Act."  17 C.F.R. § 240.13b2-1.  The SEC argues that View's books, records, and accounts were subject to this provision.  Pl. Mot. at 15–16. Prakash does not oppose partial summary judgment on this issue.  Def. Opp. at 10.

After View and CF II concluded the transaction in March 2021, View registered its stock pursuant to Section 12(b) of the Exchange Act, and its stock began to be traded on the Nasdaq Stock Market.  Hefty Mot. Decl. Ex. 10.  Accordingly, no reasonable jury could find that View was not subject to section 13(b)(2)(A) of the Exchange Act.  The Court will grant partial summary judgment on this issue.

United States District Court
Northern District of California

United States District Court
Northern District of California

**IV.    ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED THAT:

(1) Prakash's Motion for Summary Judgment as to all claims is DENIED.

(2) The SEC's Partial Motion for Summary Judgment as to whether Prakash permitted the use of his name to solicit proxies in connection with the SEC's claim for violations of Section 14(a) of the Exchange Act is GRANTED.

(3) The SEC's Partial Motion for Summary Judgment as to whether Prakash utilized interstate commerce or the mails in connection with the SEC's claims for violations of Section 17(a)(3) of the Securities Act of 1933 and Section 14(a) of the Exchange Act is GRANTED.

(4) The SEC's Partial Motion for Summary Judgment as to whether View, Inc.'s books, records, and accounts were subject to Section 13(b)(2)(A) of the Exchange Act in connection with the SEC's claim for violations of Rule 13b2-1 of the Exchange Act is GRANTED.

Dated:  November 3, 2025

_____
BETH LABSON FREEMAN
United States District Judge